BOTTINI & BOTTINI, INC.
Francis A. Bottini, Jr. (SBN 175783)
Yury A. Kolesnikov (SBN 271173)
7817 Ivanhoe Avenue, Suite 102
La Jolla, California 92037
Telephone:   (858) 914-2001
Facsimile:    (858) 914-2002
E-mail:        fbottini@bottinilaw.com
                   ykolesnikov@bottinilaw.com

*Attorneys for Plaintiff Natalie Ocegueda*

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| NATALIE OCEGUEDA, derivatively on behalf of FACEBOOK, INC., a Delaware Corporation, | Case No. _____ |
| Plaintiff, | **SHAREHOLDER DERIVATIVE COMPLAINT** |
| vs. | **Demand for Jury Trial** |
| MARK ZUCKERBERG, SHERYL SANDBERG, MARC ANDREESSEN, PETER A. THIEL, REED HASTINGS, ERSKINE B. BOWLES, SUSAN DESMOND-HELLMANN, and JAN KOUM, | |
| Defendants, | |
| - and - | |
| FACEBOOK, INC., | |
| Nominal Defendant. | |

Shareholder Derivative Complaint

Plaintiff Natalie Ocegueda ("Plaintiff"), a current shareholder and customer of Facebook, Inc. ("Facebook" or the "Company"), by and through undersigned counsel, brings this shareholder derivative action on behalf of Facebook and against certain present and former directors and officers of Facebook in connection with their breaches of fiduciary duties and violations of federal and state laws arising from the misappropriation and unauthorized use by Cambridge Analytica of personal information pertaining to 50 million Facebook users.  In support of these claims, Plaintiff alleges the following (1) upon personal knowledge with respect to the matters pertaining to Plaintiff and Plaintiff's ownership of Facebook stock and her use of Facebook; and (2) upon information and belief with respect to all other matters, based upon the investigation undertaken by counsel, which included, *inter alia*, (a) the Company's public filings with the U.S. Securities and Exchange Commission ("SEC"); (b) news articles, conference call transcripts, analysts' reports, and press releases; and (c) other publicly available information pertaining to Facebook and the topics addressed herein.  Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth below after a reasonable opportunity for discovery.

## INTRODUCTION

1.     This is a shareholder derivative action to remedy the wrongdoing committed by the Individual Defendants pertaining to their maintenance of lax user privacy and data security controls at Facebook that allowed and facilitated illicit sharing of personal user information through the applications on the Facebook platform.

2.     On March 17, 2018, *The New York Times* and the *Guardian's Observer* reported that over a period of several years, Cambridge Analytica, a data analytics firm, had received access to and retained personal user information pertaining to 50 million Facebook users without the knowledge of most of the users or their informed consent.

3.     The misappropriated user data was collected through a Facebook application known as "thisisyourdigitallife," which was built by Dr. Aleksandr Kogan, a Cambridge research professor, through a company called Global Science Research

("GSR") and in cooperation with Christopher Wylie, a Canadian data analytics expert.

4.      Nearly 300,000 Facebook users downloaded the application using their Facebook login credentials, which, under Facebook's developer platform, allowed the developer of the application (Kogan) to access not only the application users' personal data, but also personal user data pertaining to the users' Facebook "friends."

5.      Ultimately, Facebook's illicit scheme and its deficient internal controls allowed Kogan to collect personal user information pertaining to 50 million users, which data Kogan then shared with Cambridge Analytica.  As Wylie (who worked with Cambridge Analytica) told the *Observer*:  "We exploited Facebook to harvest millions of people's profiles.  And built models to exploit what we knew about them and target their inner demons.  That was the basis the entire company was built on."

6.      Facebook knew about the deficiencies in its platform by August 2011, when a complaint was filed with the Irish Data Protection Commission ("DPC"), flagging the exact same "data sinkhole" as the one that allowed Kogan to access the data related to 50 million users through the "thisisyourdigitallife" application.

7.      Despite this knowledge and the DPC's recommendation that Facebook tighten the application permissions on its platform, it was not until 2014 that Facebook announced that it was shutting down the application feature that allowed the sharing of users' friends' personal information.   And it was not until May 2015 that Facebook finally made the change and cut off the applications' access to this data.

8.      Kogan's access to the data was known to Facebook by at least 2015, and Facebook claimed that the manner in which the user information was obtained was consistent with Facebook's policies and developer application programming interface in place at the time.  Subsequently, Facebook also found out that Kogan shared the personal user information that he obtained with unauthorized third parties.

9.      Although Facebook and the Individual Defendants learned, by at least 2015, that the Company's Platform Policies were violated, Facebook did not inform the millions of affected users or make any meaningful efforts to recover and secure the

Shareholder Derivative Complaint                                                                                2

private information pertaining to the 50 million Facebook users.

10.     The revelations regarding Facebook's lax practices with regard to user privacy and data security and its failure to notify its users of the Cambridge Analytica data misappropriation seriously damaged the Company's reputation and imposed significant costs on it, including by way of regulatory investigations, lost business, exposure to a multiplicity of consumer and shareholder lawsuits, and damages.

11.     Facebook's stock fell 7 percent by the market's close on March 19, 2018, and nearly another 2 percent on March 20, 2018, erasing nearly $50 billion in market capitalization in just a few days.  Federal regulators and State Attorneys General are opening investigations into Facebook's handling of user data and its knowledge of the data misappropriation, and politicians in both United States and Europe have called for Facebook's chief executive officer, Mark Zuckerberg, to testify before them.

12.     Moreover, in the wake of this chaos, it was reported that Facebook's Chief Information Security Officer ("CISO"), Alex Stamos, would be stepping down after internal disagreement with the way the Company handled concerns regarding third parties' alleged use of the Facebook platform to spread misinformation.

13.     In the years leading up to the Cambridge Analytica data misappropriation, the Individual Defendants were faced with numerous "red flag" warnings indicating that Facebook's user privacy and data security were materially deficient.  Specifically, Facebook and the Individual Defendants were informed on numerous occasions by current and former Facebook employees, including Stamos, about the risks associated with Facebook's policies and practices concerning data sharing.  Notwithstanding these "red flags," the Individual Defendants did nothing and did not disclose the improper information-sharing activities or the Cambridge Analytica data misappropriation to the public.

14.     Facebook's failure to disclose is particularly egregious in light of the fact that, in 2011, Facebook entered into a consent order with the U.S. Federal Trade Commission ("FTC") to settle charges that the Company deceived consumers by telling

them they could keep their information on Facebook private, and then repeatedly allowing the information to be shared and made public ("Consent Order").

15. The Consent Order required Facebook to take several steps to make sure it lives up to its privacy promises, including giving consumers clear and prominent notice and obtaining consumers' express consent before their information is shared beyond the privacy setting they have established. The Consent Order also barred Facebook from making any further deceptive privacy claims and required Facebook to get consumers' approval before it changes the way it shares their data. The improper information-sharing activities alleged herein or Facebook's failure to disclosure the data misappropriation likely violated the Consent Order.

16. Simply put, the Individual Defendants repeatedly failed to serve the best interests of Facebook and its users and shareholders. As a result of their misconduct, the Individual Defendants are liable to the Company for breaches of fiduciary duties as well as other related violations of federal and state laws.

<strong>JURISDICTION AND VENUE</strong>

17. This Court has subject matter jurisdiction over this action under Article III of the U.S. Constitution and 28 U.S.C. § 1331 because of claims arising under Section 14(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78n(a), and SEC regulation 14a-9 promulgated thereunder. The Court has exclusive jurisdiction under Section 27 of the Exchange Act, 15 U.S.C. § 78aa. The Court has jurisdiction over the state-law claims in accordance with 28 U.S.C. § 1367.

18. This Court also has subject matter jurisdiction over this action under Article III of the U.S. Constitution and 28 U.S.C. § 1332 because Plaintiff and Defendants are citizens of different States and the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

19. This Court has jurisdiction over Defendants. Each Defendant is either a resident of California or otherwise has sufficient contacts with California in order to render the exercise of jurisdiction by this Court over them permissible under traditional

notions of fair play and substantial justice. Additionally, in connection with the misconduct alleged herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including the United States mails, interstate telephone communications, and the facilities of the national securities markets. The Court has jurisdiction over Facebook because Facebook is headquartered in Menlo Park, California and has substantial business operations in California.

20.     Venue is proper in this District in accordance with Section 27 of the Exchange Act. Venue is also proper under 28 U.S.C. § 1391(b) because: (i) Facebook maintains its principal place of business in, and has its most significant contacts with, this District; (ii) one or more of the Defendants resides in this District; (iii) a substantial portion of the transactions and wrongs complained of in this complaint occurred in this District; and (iv) Defendants received substantial compensation in this District by doing business here and engaging in numerous activities that had effects in this District.

**PARTIES**

**I.    Plaintiff**

21.     Plaintiff Natalie Ocegueda is a current Facebook shareholder and has continuously held her Facebook stock since May 21, 2012. Plaintiff is also a current customer of Facebook and was a customer at the time of the events relevant to the data misappropriation alleged herein.

**II.    Nominal Defendant**

22.     Nominal defendant Facebook is a Delaware corporation headquartered at 1601 Willow Road, Menlo Park, California 94025. Facebook operates a social networking website that allows people to communicate with their family, friends, and coworkers. Facebook develops technologies that facilitate the sharing of information, photographs, website links, and videos. Facebook users have the ability to share and restrict information based on their own specific criteria. By the end of 2017, Facebook had more than 2.2 billion active users. The Company's mission is "to give people the power to build community and bring the world closer together. People use Facebook to

stay connected with friends and family, to discover what's going on in the world, and to share and express what matters to them."  Facebook's securities trade on the NASDAQ under the ticker symbol "FB."  Facebook is a citizen of Delaware and California.

### III.    Individual Defendants

23.    Defendant Mark Zuckerberg is the Founder, Chairman and Chief Executive Officer ("CEO") of Facebook.  Zuckerberg is responsible for Facebook's day-to-day operations, as well as the overall direction and product strategy of the Company, and is the Company's controlling stockholder with ownership of stock and proxies for stock representing more than 60% of Facebook's voting power, though he owns 16% of Facebook's total equity value.  Zuckerberg is a citizen of California.

24.    Defendant Sheryl Sandberg is the Chief Operating Officer ("COO") of Facebook since 2008.  Sandberg is also a member of Facebook's board of directors ("Board") and has been a director since 2012.  Sandberg is a citizen of California.

25.    Defendant Marc Andreessen is a member of the Board and has been a director since June 2008.  Andreessen is a member of Facebook's Audit Committee and Compensation & Governance Committee.  Andreessen is a citizen of California.

26.    Defendant Erskine B. Bowles is a member of the Board and has been a director since September 2011.  Bowles serves as the Chair of the Company's Audit Committee.  Bowles is a citizen of North Carolina.

27.    Defendant Dr. Susan Desmond-Hellmann is a member of the Board and has been a director since March 2013.  Desmond-Hellmann is a member of Facebook's Audit Committee and is the Company's Lead Independent Director.  Desmond-Hellman is a citizen of Washington.

28.    Defendant Reed Hastings is a member of the Board and has been a director since June 2011.  Hastings serves as Chair of the Company's Compensation & Governance Committee.  Hastings is a co-founder of Netflix, and currently serves as its CEO and Chairman of its board of directors.  Hastings is a citizen of California.

29.    Defendant Peter A. Thiel is a member of the Board and has been a director

since April 2005.  Thiel is a member of the Company's Compensation & Governance Committee.  Thiel was one of the early investors in Facebook.  He co-founded PayPal, Inc., and has been a Partner of the Founders Fund, a venture capital firm that strives to keep founders in control of the companies they have created, since 2005.  Thiel is a citizen of California.

30.  Defendant Jan Koum is a member of the Board and has been a director since October 2014.  Koum is a citizen of California.

31.  Defendants Zuckerberg, Sandberg, Andreessen, Thiel, Hastings, Bowles, Desmond-Hellmann, and Koum are collectively referred to as the "Individual Defendants" or "Defendants."

32.  Defendants Zuckerberg, Sandberg, and Koum are collectively referred to as the "Insider Trading Defendants."

## IV.  The Doe Defendants

33.  Various other individuals, partnerships, corporations, and other business entities have participated in the violations alleged herein and have performed acts and made statements in furtherance thereof.  The true names and capacities, whether individual, corporate, associate, or otherwise of Defendants Does 1 through 10, inclusive, are unknown to Plaintiff at this time.  Plaintiff therefore sues Defendants Does 1 through 10 by such fictitious names.  Plaintiff further alleges that each of the Doe Defendants is responsible for the acts and occurrences hereinafter set forth.  Plaintiff will amend this complaint to (a) show their true names and capacities when such information is ascertained; and (b) allege the manner in which each Doe Defendant is responsible for the damages sustained by Facebook and its shareholders

## FACTUAL ALLEGATIONS

34.  Throughout the Relevant Period, the Individual Defendants caused Facebook to emphasize the importance of user privacy to Facebook's revenues and business, while concealing the fact that the Company's internal controls and policies allowed third party developers to obtain mass amounts of Facebook user information

without verification as to the nature of its use.

35.    Defendants repeatedly emphasized the importance of data security and user privacy to the Company in Facebook's public statements and acknowledged their specific responsibility for overseeing the substantial risks that a breach, like the Cambridge Analytica incident, posed to the Company.   According to Facebook's preliminary proxy statement, filed with the SEC on April 14, 2017 ("2017 Proxy"):

> Our board of directors as a whole has responsibility for overseeing our risk management. The board of directors exercises this oversight responsibility directly and through its committees. ***The oversight responsibility of the board of directors and its committees is informed by reports from our management team and from our internal audit department that are designed to provide visibility to the board of directors about the identification and assessment of key risks and our risk mitigation strategies.***

> The full board of directors has primary responsibility for evaluating strategic and operational risk management, and for CEO succession planning. Our audit committee has the responsibility for overseeing our major financial and accounting risk exposures as well as legal and regulatory risk exposures. Our audit committee also oversees the steps our management has taken to monitor and control these exposures, including policies and procedures for assessing and managing risk and related compliance efforts. Finally, our audit committee oversees our internal audit function. Our compensation & governance committee evaluates risks arising from our compensation policies and practices, as more fully described in "Executive Compensation—Compensation Discussion and Analysis—Compensation Risk Assessment." The audit committee and the compensation & governance committee provide reports to the full board of directors regarding these and other matters.

36.    Notwithstanding their significant obligations as members of the Board or corporate officers, and (for some of the Individual Defendants) as members of committees charged with overseeing Facebook's risk exposure, corporate governance, and other critical aspects of the Company's business and operations, the Individual Defendants maintained policies that allowed Kogan and other third-party app developers to obtain mass amounts of Facebook user information without verification

as to the nature of its use.  Upon learning that 50 million users' personal information had been misappropriated and used by Cambridge Analytica, the Individual Defendants failed to notify users or disclose anything about the breach, or its significant impact on the Company, publicly and to investors.  Worse, during the Relevant Period, the Individual Defendants affirmatively misrepresented and concealed these facts from the Company's regulators and in public statements and filings with the SEC.

I.     **During the Relevant Period, the Individual Defendants Repeatedly Emphasized the Importance of User Privacy and Data Security**

37.     Maintaining user privacy and data security has long been considered central to Facebook's business and growth prospects.  Defendants have assured users and investors for years that the Company monitors user accounts for precisely the type of data misappropriations that allowed Cambridge Analytica to obtain millions of users' personal information without their knowledge and informed consent.

38.     For instance, a June 21, 2013 blog post entitled "*Important Message from Facebook's White Hat Program*" provided:

> At Facebook, we take people's privacy seriously, and we strive to protect people's information to the very best of our ability.  We implement many safeguards, hire the brightest engineers and train them to ensure we have only high-quality code behind the scenes of your Facebook experiences. We even have teams that focus exclusively on preventing and fixing privacy related technical issues before they affect you … .  Your trust is the most important asset we have, and we are committed to improving our safety procedures and keeping your information safe and secure.

39.     Similarly, an October 16, 2015 post by Facebook's CISO, Stamos, stated:

> ***The security of people's accounts is paramount at Facebook, which is why we constantly monitor*** for potentially malicious activity and offer many options to proactively secure your account.  Starting today, we will notify you if we believe your account has been targeted or compromised by an attacker suspected of working on behalf of a nation-state.

> *   *   *

> While we have always taken steps to secure accounts that we believe to have been compromised, we decided to show this additional warning if we have a strong suspicion that an attack could be

government-sponsored.  We do this because these types of attacks tend to be more advanced and dangerous than others, and we strongly encourage affected people to take the actions necessary to secure all of their online accounts.

It's important to understand that ***this warning is not related to any compromise of Facebook's platform or systems***, and that having an account compromised in this manner may indicate that your computer or mobile device has been infected with malware.  Ideally, people who see this message should take care to rebuild or replace these systems if possible.

To protect the integrity of our methods and processes, we often won't be able to explain how we attribute certain attacks to suspected attackers.  That said, we plan to use this warning only in situations where the evidence strongly supports our conclusion.  We hope that these warnings will assist those people in need of protection, and we will continue to improve our ability to prevent and detect attacks of all kinds against people on Facebook.

40.     In a post to the Company's website on March 18, 2018, Facebook VP Adam Bosworth noted that maintaining user privacy is in the Company's best interests, noting the possibly indirect effects on Facebook's revenues.  "Yes developers can receive data that helps them provide better experiences to people, but we don't make money from that directly and have set this up in a way so that no one's personal information is sold to businesses," Bosworth wrote.  "If people aren't having a positive experience connecting with businesses and apps then it all breaks down.  This is specifically what I mean when we say our interests are aligned with users when it comes to protecting data."

41.     The Company's failure to detect and prevent the Cambridge Analytica data misappropriation, or to adequately respond with proper notification and disclosures in accordance with best practices and applicable laws, belies any claim that Facebook's actual "monitoring" practices and internal controls were sufficient.

/ / /

/ / /

/ / /

## II. Defendants Maintained Policies that Permitted App Developers to Obtain User Information Without the Users' Knowledge or Informed Consent

42. Since 2007, Facebook has allowed outside developers to build and offer their own applications within its space.

43. During this time, Facebook's developer page also allowed developers to access account information regarding users and their friends. For example, the following information was available to developers in 2013:[1]



---

[1]*See* Extended Profile Properties, *available at* https://web.archive.org/web/20130911191323/https://developers.facebook.com/docs/reference/login/extended-profile-properties/ (last visited Mar. 23, 2018).

| user_questions | friends_questions | Provides access to the questions the user or friend has asked |
| user_relationships | friends_relationships | Provides access to the user's family and personal relationships and relationship status |
| user_relationship_details | friends_relationship_details | Provides access to the user's relationship preferences |
| user_religion_politics | friends_religion_politics | Provides access to the user's religious and political affiliations |
| user_status | friends_status | Provides access to the user's status messages and checkins. Please see the documentation for the location_post table for information on how this permission may affect retrieval of information about the locations associated with posts. |
| user_subscriptions | friends_subscriptions | Provides access to the user's subscribers and subscribes |
| user_videos | friends_videos | Provides access to the videos the user has uploaded, and videos the user has been tagged in |
| user_website | friends_website | Provides access to the user's web site URL |
| user_work_history | friends_work_history | Provides access to work history as the work property |

44.     These extended profile properties show that, *as a direct result of how Facebook platform was structured*, Kogan had all the information at his fingertips and did not have to hack into Facebook's system to obtain the information.

45.     Facebook knew about the deficiencies in its platform *by August 2011*, when a complaint was filed with the Irish DPC, flagging the exact same "data sinkhole" as the one that allowed Kogan to access the data related to 50 million users through the "thisisyourdigitallife" application.   As a result of the lawsuit, the Irish DPC recommended that Facebook tighten the application permissions on its platform.

46.     Despite this knowledge and the DPC's recommendation, it was not until 2014 that Facebook announced that it was shutting down the application feature that allowed the sharing of users' friends' information.   And it was not until May 2015 that Facebook finally made the change and cut off the applications' access to this data.

47.     Indeed, in response to an inquiry from *WIRED*, Facebook's Vice President and Deputy General Counsel, Paul Grewal, confirmed that Facebook personnel were aware of user privacy issues similar to the Cambridge Analytica incident by at least 2014, and knew that updates to Facebook's policies and data security practices were necessary to alleviate concerns that had already been expressed by Facebook users.  "In 2014, after hearing feedback from the Facebook community, we made an update to ensure that each person decides what information they want to share about themselves, including their friend list." Grewal stated.  "Before you decide to use an app, you can

review the permissions the developer is requesting and choose which information to share.  You can manage or revoke those permissions at any time."

48.    Facebook has also publicly admitted that it knew, *as of 2015*, that Kogan improperly shared the information harvest by his application with the data analytics firm Cambridge Analytica, in breach of Facebook's policies for developers.

49.    For example, a post by Grewal published on March 16, 2018, and updated on March 17, 2018, stated, in relevant part:

> In 2015, we learned that a psychology professor at the University of Cambridge named Dr. Aleksandr Kogan lied to us and violated our Platform Policies by passing data from an app that was using Facebook Login to SCL/Cambridge Analytica, a firm that does political, government and military work around the globe.  He also passed that data to Christopher Wylie of Eunoia Technologies, Inc.

> Like all app developers, Kogan requested and gained access to information from people after they chose to download his app.  His app, "thisisyourdigitallife," offered a personality prediction, and billed itself on Facebook as "a research app used by psychologists."  Approximately 270,000 people downloaded the app.  In so doing, they gave their consent for Kogan to access information such as the city they set on their profile, or content they had liked, as well as more limited information about friends who had their privacy settings set to allow it.  Although Kogan gained access to this information in a legitimate way and through the proper channels that governed all developers on Facebook at that time, he did not subsequently abide by our rules.  By passing information on to a third party, including SCL/Cambridge Analytica and Christopher Wylie of Eunoia Technologies, he violated our platform policies.

> When we learned of this violation in 2015, we removed his app from Facebook and demanded certifications from Kogan and all parties he had given data to that the information had been destroyed.  Cambridge Analytica, Kogan and Wylie all certified to us that they destroyed the data.

50.    Similarly, in a Facebook message dated March 21, 2018, Zuckerberg admitted that Facebook knew of the Cambridge Analytica incident by 2015:

> In 2015, we learned from journalists at *The Guardian* that Kogan had shared data from his app with Cambridge Analytica.  It is against our

policies for developers to share data without people's consent, so we immediately banned Kogan's app from our platform, and demanded that Kogan and Cambridge Analytica formally certify that they had deleted all improperly acquired data.  They provided these certifications.

51.    When Kogan offered his application, Facebook allowed developers to collect information on friends of those who chose to use their applications if their privacy settings allowed it.  In an e-mail to university colleagues, Kogan said that in 2014, he used an official Facebook platform for developers to change the terms and conditions of his application from "research" to "commercial use," and that at no point then did Facebook object.  Kogan's e-mail further stated:  "Through the app, we collected public demographic details about each user (name, location, age, gender), and their page likes (*e.g.*, the Lady Gaga page).  We collected the same data about their friends whose security settings allowed for their friends to share their data through apps.  Each user who authorized the app was presented with both a list of the exact data we would be collecting, and also a Terms of Service detailing the commercial nature of the project and the rights they gave us as far as the data.  Facebook themselves have been on the record saying that the collection was through legitimate means."

52.    Kogan's position contradicts Facebook's stance that Kogan violated the Company's terms and services and then lied about it.  "We clearly stated that the users were granting us the right to use the data in broad scope, including selling and licensing the data," Kogan wrote in a March 18, 2018 e-mail obtained by *Bloomberg*.  "These changes were all made on the Facebook app platform and thus they had full ability to review the nature of the app and raise issues."

53.    The allegations in a lawsuit filed by the makers of Pikinis, an application that was shut down three years ago when Facebook finally cut off third-party access to a back-door channel to friends' data, also undermine Facebook's suggestion that it has always placed user privacy interests at the forefront of its business.

54.    Pikinis alleged that Facebook engaged in "an anti-competitive bait-and-switch scheme" that duped Six4Three and tens of thousands of other developers into

making hefty investments to build apps and then decided "it would be in Facebook's best interest to no longer compete with many developers and to shut down their businesses." While Facebook has denied any wrongdoing in the Pikinis lawsuit, its response confirms that Facebook has always had the ability to change its practices with respect to third party developers, but did not. "Facebook made — and must continue to make — important editorial decisions about what third party content is available through its platform to protect its users' privacy and experience," the Company argued in a February 2018 court filing.

55. Defendants not only had the ability to change Facebook's policies and practices with respect to third party developer access to user information, they were also well aware of the information leaks and the risk that Facebook's lax data security practices and user privacy policies could cause substantial damage to the Company's business and reputation, yet failed to act to prevent such harm.

56. By 2013, Facebook had experienced at least one major attack to its security systems and represented that it was "working continuously" to prevent similar security threats in the future.

57. A February 15, 2013 post entitled "*Protecting People on Facebook*" stated:

> Facebook, like every significant internet service, is frequently targeted by those who want to disrupt or access our data and infrastructure. As such, *we invest heavily in preventing, detecting, and responding to threats that target our infrastructure, and we never stop working to protect the people who use our service.* The vast majority of the time, we are successful in preventing harm before it happens, and our security team works to quickly and effectively investigate and stop abuse.

> Last month, Facebook Security discovered that our systems had been targeted in a sophisticated attack. As soon as we discovered the presence of the malware, we remediated all infected machines, informed law enforcement, and began a significant investigation that continues to this day. We have found no evidence that Facebook user data was compromised.

> As part of our ongoing investigation, we are working continuously and closely with our own internal engineering teams, with security teams

Shareholder Derivative Complaint                                                           15

at other companies, and with law enforcement authorities to learn everything we can about the attack, and how to prevent similar incidents in the future. …

We will continue to work with law enforcement and the other organizations and entities affected by this attack. It is in everyone's interests for our industry to work together to prevent attacks such as these in the future.

58.     Even after Facebook changed its policy in 2014 to supposedly protect user information from being exploited by outsiders, however, Facebook gave developers a *full year* before it ended their access to friends' newsfeeds and photos.

## III.     Defendants Failed to Act in the Face of Numerous "Red Flag" Warnings

59.     The Board was required to oversee Facebook's compliance with the FTC Consent Order and other applicable laws, and to implement and monitor a reasonable system of internal controls and policies relating to user privacy and data security.

60.     Yet, during the relevant period, Defendants failed to act in the face of numerous "red flag" warnings indicating that the Company's internal controls and policies were not only insufficient, but actually fostered the privacy and data security issues that ultimately enabled Cambridge Analytica to obtain the personal information of 50 million Facebook users without their knowledge and informed consent.

### A.     Early Litigation Involving User Privacy Claims

61.     Facebook has weathered complaints about violating user privacy since its earliest days without radically altering its practices.

62.     For example, in 2006, Facebook users protested that the service's news feed was making public information that the users had intended to keep private.  The news feed is now the Company's core service.

63.     In 2009, Facebook began making users' posts, which had previously been private, public by default.  That incident triggered anger, confusion, an investigation by the FTC, and, ultimately, a consent decree.

64.     In March 2010, Facebook settled a class action for $9.5 million to resolve claims regarding its Beacon feature, which tracked what users buy online and shared

1 the information with their friends.

2 65. In December 2012, Facebook settled a class action for $20 million over

3 claims that it used subscribers' names without their permission to advertise products in

4 its "sponsored stories" section.

5 **B.      The FTC Action and Consent Order**

6 66. In 2011, following an investigation by the FTC, Facebook entered into a

7 Consent Order to resolve the FTC's allegations that the claims Facebook made about its

8 privacy practices were unfair and deceptive and violated federal law.

9 67. The FTC complaint listed a number of instances in which Facebook

10 allegedly made promises that it did not keep:

11     a.      In December 2009, Facebook changed its website so certain

12     information that users may have previously designated as private — such as

13     their "friends list" — was made public.  Facebook didn't warn users that this

14     change was coming or obtain the users' approval in advance.

15     b.      Facebook represented that third-party apps installed by the users

16     would have access only to user information that they needed to operate.  In

17     reality, however, the apps could access nearly all of the users' personal data —

18     including personal user data the apps did not need to operate.

19     c.      Facebook told users they could restrict sharing of data to limited

20     audiences — for example, with "friends only."  In reality, however, selecting

21     "friends only" did not prevent the users' information from being shared with

22     third-party applications that the users' friends used.

23     d.      Facebook had a "Verified Apps" program and claimed it certified

24     the security of participating apps.  In reality, it did not.

25     e.      Facebook promised users that it would not share their personal

26     information with advertisers.  In reality, it did.

27     f.      Facebook claimed that when users deactivated or deleted their

28     accounts, their photos and videos would be inaccessible.  But Facebook allowed

Shareholder Derivative Complaint                                                              17

access to the content, even after users had deactivated or deleted their accounts.

       g.    Facebook claimed that it complied with the U.S.–EU Safe Harbor Framework that governs data transfer between the United States and the European Union.  In actuality, it did not.

68.    The Consent Order barred Facebook from making any further deceptive privacy claims, required that the Company get consumers' approval before it changes the way it shares their data, and required that Facebook obtain periodic assessments of its privacy practices by independent, third-party auditors for 20 years following its entry.  Specifically, under the Consent Order, Facebook is:

       a.    barred from making misrepresentations about the privacy or security of consumers' personal information;

       b.    required to obtain consumers' affirmative express consent before enacting changes that override their privacy preferences;

       c.    required to prevent anyone from accessing a user's personal data more than 30 days after the user has deleted his or her account;

       d.    required to establish and maintain a comprehensive privacy program designed to address privacy risks associated with the development and management of new and existing products and services, and to protect the privacy and confidentiality of consumers' information; and

       e.    required, every two years for the next 20 years following the entry of the Consent Order, to obtain independent, third-party audits certifying that it has a privacy program in place that meets or exceeds the requirements of the FTC order, and to ensure that the privacy of consumers' information is protected.

69.    In the FTC's press release announcing the settlement and terms of the Consent Order, issued on November 29, 2011, FTC Chairman Jon Leibowitz stated: "Facebook is obligated to keep the promises about privacy that it makes to its hundreds of millions of users … .  Facebook's innovation does not have to come at the expense of consumer privacy.   The FTC action will ensure it will not."

### C.     Reports from Facebook's CISO and Other Sources at the Company

70.     In June 2015, Stamos joined Facebook as its Chief Information Security Officer.  According to *The New York Times*, current and former employees reported that Stamos got off on the wrong foot with some executives, including Defendant Sandberg, over how best to police the platform.  Internally, Stamos repeatedly argued that Facebook needed to act more like a defense contractor in dealing with security, given that the social network was becoming a similar target for nation states.  In an audio leaked in October 2017 to ZDNet, a tech news site, Stamos told his security team that he explained to Facebook management "that we have the threat profile of a Northrop Grumman or a Raytheon or another defense contractor, but we run our corporate network, for example, like a college campus, almost."  The tape infuriated Stamos's bosses, according to the current and former employees, and a leak investigation is continuing.  The employees said that some executives believed Stamos had leaked the audio himself to get Facebook to take his statements more seriously.

71.     While the plethora of earlier "red flag" warnings should have caused the Board to seriously address what was a systemic problem with the Company's privacy and data security practices, the so-called "White Paper" that Stamos co-authored, entitled "*Information Operations and Facebook,*" unquestionably alerted Defendants that those activities were pervasive and supported by management.  The initial version of Stamos's report clearly indicated that the Company's internal controls were deficient, and as revised, the report confirmed that Defendants' public statements were false and misleading, affirmatively misrepresenting that Facebook had "no evidence of any Facebook accounts being compromised" in connection with the 2016 election as of the date the revised, toned-down version of the report was published on April 27, 2017.

72.     Stamos said that he had initially provided a written report to Facebook executives concerning the circumstances that led to the Cambridge Analytica data misappropriation, but instead of taking appropriate action and disclosing the data misappropriation, the report was rewritten and presented as a hypothetical scenario in

order to further suppress and conceal the wrongdoing at Facebook that led to — and, indeed, facilitated — the data misappropriation.

73.     The portion of the revised report entitled "*A Deeper Look: A Case Study of a Recent Election*" stated:

> During the 2016 US Presidential election season, we responded to several situations that we assessed to fit the pattern of information operations.  **We have no evidence of any Facebook accounts being compromised as part of this activity**, but, nonetheless, we detected and monitored these efforts in order to protect the authentic connections that define our platform.
>
> One aspect of this included malicious actors leveraging conventional and social media to share information stolen from other sources, such as email accounts, with the intent of harming the reputation of specific political targets.   These incidents employed a relatively straightforward yet deliberate series of actions:
>
> • Private and/or proprietary information was accessed and stolen from systems and services (outside of Facebook);
>
> • Dedicated sites hosting this data were registered;
>
> • Fake personas were created on Facebook and elsewhere to point to and amplify awareness of this data;
>
> • Social media accounts and pages were created to amplify news accounts of and direct people to the stolen data.
>
> • From there, organic proliferation of the messaging and data through authentic peer groups and networks was inevitable.
>
> Concurrently, a separate set of malicious actors engaged in false amplification using inauthentic Facebook accounts to push narratives and themes that reinforced or expanded on some of the topics exposed from stolen data.  Facebook conducted research into overall civic engagement during this time on the platform, and determined that the reach of the content shared by false amplifiers was marginal compared to the overall volume of civic content shared during the US election.
>
> In short, while we acknowledge the ongoing challenge of monitoring and guarding against information operations, the reach of known operations during the US election of 2016 was statistically very small compared to overall engagement on political issues.
>
> Facebook is not in a position to make definitive attribution to the

Shareholder Derivative Complaint                                                    20

actors sponsoring this activity.  It is important to emphasize that this example case comprises only a subset of overall activities tracked and addressed by our organization during this time period; however our data does no contradict the attribution provided by the U.S. Director of National Intelligence in the report dated January 6, 2017.

74.     On October 22, 2017, the *Guardian* reported:

Facebook has handed to the special counsel and congressional investigators looking into the Kremlin's interference the content of 3,000 political ads paid for by a shadowy Russian entity called the Internet Research Agency (IRA).  The company's chief operating officer, Sheryl Sandberg, said Facebook owed the nation "not just an apology but determination" to defeat attempts to subvert US democracy.

. . .

However, [Sandberg] was vague on the question of when Facebook's management became aware of large-scale Russian manipulation, saying only:  "We started to hear the rumours around the election itself of a different kind of attack."

75.     According to *The New York Times*, by October 2017, the relationship between Stamos and Defendant Sandberg had deteriorated over how to handle the alleged Russian interference on Facebook and how best to reorganize Facebook's security team before the midterm elections, according to more than half a dozen people who work or formerly worked at the Company.  During this time, among other things, Stamos proposed that instead of reporting to Facebook's general counsel, Colin Stretch, he report directly to Facebook's higher-ups.  Instead, executives released Stamos from much of his day-to-day responsibilities, employees said.

76.     Sandy Parakilas, a former Facebook platforms operations manager for policing data breaches by third-party software developers between 2011 and 2012, stated that as many as hundreds of millions of Facebook users are likely to have had their private information harvested by companies that exploited the same terms as the firm that collected data and passed it on to Cambridge Analytica.

77.     Parakilas stated that he warned senior executives at the Company that its lax approach to data protection risked a major breach.  His concerns were "that all of

the data that left Facebook servers to developers could not be monitored by Facebook, so [Facebook] had no idea what developers were doing with the data" and that the Company did not use enforcement mechanisms, including audits of external developers, to ensure data was not being misused.  Parakilas confirmed that Facebook's "trust model" was rife with security vulnerabilities and a near total abdication of its responsibility to audit its own rules limiting the use of Facebook data by third parties. According to Parakilas, Facebook "felt that it was better not to know."

78.    Roger McNamee, a longtime Silicon Valley investor, warned Defendants of Facebook's data security issues by at least 2016, warnings which also went unheeded. McNamee was Defendant Zuckerberg's mentor before Facebook went public as well as an early investor in the Company.  McNamee and Zuckerberg first met in 2006 when Facebook's then Chief Privacy Officer, Chris Kelly, called McNamee to give some advice to Zuckerberg on whether or not to sell the Company to Yahoo.  At that time, McNamee advised Zuckerberg against selling the Company.  After this meeting, McNamee and Zuckerberg developed a close mentoring relationship, with McNamee reportedly acting as a father figure to Zuckerberg.  McNamee suggested Zuckerberg hire Defendant Sandberg as Facebook's COO, which Zuckerberg did.  By the time Facebook went public, McNamee was no longer a mentor to Zuckerberg.  That role was taken over by Facebook directors Andreessen and Thiel.

79.    In approximately February 2016, McNamee stated that he began noticing anti-Clinton memes originating from Facebook groups purportedly supporting Bernie Sanders.  McNamee never suspected that the Sanders campaign was pushing out the memes, which made him worry that Facebook was being used in a way Zuckerberg had not intended.  McNamee saw a similar thing happening before the Brexit vote.

80.    Following the Brexit vote, McNamee wrote an op-ed piece for Recode, warning that Facebook was being manipulated by "bad actors."  In the article, McNamee concluded that the problem seemed to be "systemic — the algorithms themselves made the site vulnerable because they were coded to prioritize attention,

and attention is best gained by messages that elicit fear, outrage, and hate-sharing."

81.    On October 30, 2016, McNamee sent a draft of the op-ed piece to Zuckerberg and Sandberg as a courtesy.  According to McNamee:

> They each responded the next day.  The gist of their messages was the same:  We appreciate you reaching out; we think you're misinterpreting the news; we're doing great things that you can't see.  Then they connected me to Dan Rose, a longtime Facebook executive with whom I had an excellent relationship.  Dan is a great listener and a patient man, but he was unwilling to accept that there might be a systemic issue.  Instead, he asserted that Facebook was not a media company, and therefore was not responsible for the actions of third parties.

McNamee ultimately did not publish the op-ed piece, explaining, "Mark and Sheryl were my friends, and my goal was to make them aware of the problems so they could fix them.  I certainly wasn't trying to take down a company in which I still hold equity."

82.    Defendants ignored the warnings from McNamee.

**D.    Media Reports Concerning Cambridge Analytica's Data Usage**

83.    In 2015, the *Guardian* reported that Cambridge Analytica was using data from "tens of millions" of Facebook users "harvested without permission" in support of Ted Cruz's presidential campaign.  In 2017, the *Intercept* reported something similar, but stated that 30 million Facebook users, rather than 50 million, had been affected.

**E.    Foreign Government Investigations and Lawsuits**

84.    Max Schrems, an Austrian lawyer and privacy activist, said he told Ireland's data protection authority some time ago of loopholes in Facebook's policy that allowed applications to "harvest" data about users' friends without their consent. "We flagged it in 2011," Schrems said.  "Now it emerges that in 2014 Cambridge Analytica started doing precisely what we warned about three years earlier."

85.    On September 11, 2017, the Spanish Agency for Data Protection ("AEPD") announced that it had fined Facebook €1.2 million for violating data protection regulations following its investigation to determine whether the data processing carried out by the Company complied with the data protection regulations.  The AEPD stated that its investigation made it possible to verify that Facebook does not inform the users

in a comprehensive and clear way about the data that it will collect and the treatments that it will carry out with them, but that it is limited to giving some examples.  In particular, the AEPD found that Facebook collects other data derived from the interaction carried out by users on the platform and on third-party sites without them being able to clearly perceive the information that Facebook collects about them or with what purpose they are going to use it.  The AEPD also found that the privacy policy of Facebook contains generic and unclear expressions, and requires access to a multitude of different links to know it.  Further, the AEPD concluded that the Company makes an inaccurate reference to the use it will make of the data it collects, so that a Facebook user with an average knowledge of the new technologies does not become aware of the data collection or storage and subsequent treatment, or what they will be used for.

86.    The French data protection authority fined Facebook its maximum allowable fine of €150,000 in May 2017 for the same violations claimed by the Spanish authorities.  "Facebook proceeded to a massive compilation of personal data of internet users in order to display targeted advertising," complained the Commission Nationale de l'Informatique et des Libertés.  "It collected data on the browsing activity of internet users on third-party websites, via the 'datr' cookie, without their knowledge."

87.    On March 20, 2018, a committee within the British Parliament sent a letter to Defendant Zuckerberg that asked him to appear before the panel to answer questions on the Company's connection to Cambridge Analytica.  The president of the European Parliament also requested an appearance by Zuckerberg.  "The committee has repeatedly asked Facebook about how companies acquire and hold on to user data from their site, and in particular about whether data had been taken without their consent," wrote Damian Collins, chairman of the British committee.  "Your officials' answers have consistently understated this risk, and have been misleading to the committee."

88.    On March 21, 2018, Parakilas, a former Facebook platform operations manager from 2011 to 2012, told British lawmakers that his concerns about lax data protection policies at the Company went ignored by "senior executives."  He appeared

before the U.K. parliament committee investigating the impact of social media on recent elections.  "I made a map of the various data vulnerabilities of the Facebook platform," Parakilas told the committee.  "I included lists of bad actors and potential bad actors," he said, "and said here's some of the things these people could be doing and here's what's at risk."  When asked by the committee if any of those executives were still at the company, Parakilas said they were, but declined to name them in public.

89.     Parakilas previously told the *Guardian* on March 20, 2018 that he had warned Facebook's senior executives about how the Company's data protection policies posed a risk of breach.  Parakilas explained, "My concerns were that all of the data that left Facebook servers to developers could not be monitored by Facebook."  He also said that Facebook could have prevented the Cambridge Analytica data misappropriation.

**IV.     U.S. Attorney General Investigations**

90.     Following the revelation of the nature and scope of the Cambridge Analytica data misappropriation, Facebook's user privacy and data security practices have become the subject of multiple government inquiries.

91.     In the days after the data misappropriation was publicly revealed, the Attorney General of Massachusetts announced an investigation into Facebook and Cambridge Analytica.  On March 19, 2018, Senator Ron Wyden followed up with a detailed series of questions for Facebook to answer.

92.     Senators Amy Klobuchar, Democrat of Minnesota, and John Kennedy, Republican of Louisiana, have asked the chairman of the Judiciary Committee, Charles E. Grassley, Republican of Iowa, to hold a hearing.  Republican leaders of the Senate Commerce Committee, organized by Senator John Thune of South Dakota, wrote a letter on March 19, 2018 to Zuckerberg demanding answers to questions about how the data had been collected and if users were able to control the misuse of data by third parties.  "It's time for Mr. Zuckerberg and the other C.E.O.s to testify before Congress," Senator Mark Warner, Democrat of Virginia, said on March 20, 2018.

/ / /

**V.    The FTC Investigation into Possible Consent Order Violations**

93.    Facebook is also facing an investigation by the FTC, which is looking into whether Facebook violated an agreement with the agency, according to a person with knowledge of the inquiry.  The FTC investigation is connected to the Consent Order that Facebook agreed to as part of a settlement with the FTC in 2011 after the FTC found that the Company had told users that third-party apps on the social media site, like games, would not be allowed to access their data.  The FTC found that the apps, by contrast, were able to obtain almost all personal information about a user.

94.    The current FTC investigation involves similar concerns about Facebook's user privacy practices, focusing specifically on its compliance with the Consent Order. In an interview with the *Washington Post*, David Vladeck, former director of the FTC's Bureau of Consumer Protection, said that the Cambridge Analytica incident may have violated Facebook's 2011 consent decree.  "There are all sorts of obligations under the consent decree that may not have been honored here," he said.  "I will not be surprised if at some point the FTC looks at this.  I would expect them to … ."  Jessica Rich, who also served as director of the bureau and was deputy director under Vladeck, said, "Depending on how all the facts shake out, Facebook's actions could violate any of all of these provision, *to the tune of many millions of dollars in penalties*.  They could also constitute violations of both U.S. and EU laws."  She added that "*Facebook can look forward to multiple investigations and potentially a whole lot of liability here*."

95.    "We are aware of the issues that have been raised but cannot comment on whether we are investigating," an FTC spokeswoman said in a statement on March 20, 2018.  "We take any allegations of violations of our consent decrees very seriously."

96.    Facebook also said it expected to receive questions from the FTC related to potential violations of the 2011 consent decree.  "We remain strongly committed to protecting people's information," Facebook's deputy chief privacy officer, Rob Sherman, said in a statement.  "We appreciate the opportunity to answer questions the FTC may have."

97.     Facebook could face fines of $40,000 a day per violation if the FTC finds that Facebook broke the agreement.

**VI.     Defendants Cause Facebook to File a Materially Misleading Proxy Statement**

98.     Defendants violated Section 14(a) of the Exchange Act and SEC Rule 14a-9 by causing Facebook to issue the 2017 Proxy that failed to disclose the Cambridge Analytica data misappropriation or the seriously-deficient internal and disclosure controls that allowed the scheme to begin and helped perpetuate it.  Defendants' failure to disclose these material facts constitutes a breach of their fiduciary duties.

99.     The Exchange Act requires publicly traded companies to disclose to shareholders "material information," the kind of information that an investor would want to know to protect their investment.  The SEC issued guidance on public reporting of cybersecurity incidents, noting that the SEC "encourages companies to continue to use Form 8-K or Form 6-K to disclose material information promptly, including disclosure pertaining to cybersecurity matters."  In 2015, 2016, and 2017, Facebook did not mention the Cambridge Analytica incident in any of its Form 8-K or Form 6-K filings.  Instead, Facebook made general statements in their most recent proxy statement and annual report on Form 10-K about potential, not actual, user privacy and data security risks, and certified that the Company's internal controls were adequate and complied with applicable laws (which necessarily include the FTC consent order).

100.     On April 14, 2017, Defendants caused Facebook to file the 2017 Proxy in connection with the 2017 annual stockholders meeting to be held on June 1, 2017.

101.     The 2017 Proxy was materially misleading because it failed to disclose:

    a.     that the Cambridge Analytica data misappropriation had occurred;

    b.     Defendants' knowledge that Facebook's internal controls and systems were inadequate and ineffective to protect user information;

    c.     Defendants' knowledge of data security failures that had actually materialized and had not been disclosed;

    d.     that Facebook's internal controls and systems were inadequate to

ensure that the Company complied with applicable notification and disclosure requirements concerning the Cambridge Analytica data misappropriation;

e.     that Defendants failed to maintain appropriate policies and procedures to detect and prevent data security leaks and to protect user information;

f.     that Defendants failed to appropriately address Facebook's privacy practices and misleading claims regarding the same as required by the FTC consent order; and

g.     that, as a result, Facebook may be in violation of the Consent Order.

102.   The 2017 Proxy harmed Facebook by interfering with the proper governance on its behalf that follows stockholders' informed voting of directors. As a result of the false or misleading statements in the 2017 Proxy, Facebook stockholders voted to re-elect all of the Defendants to the Board.

103.   The statements in the 2017 Proxy conveyed that the Company's corporate governance structure was "effective" and provided "oversight of management and Board accountability."  In reality, Facebook's corporate government structure allowed senior executives and the Board to sidestep real accountability and instead continue perpetuating the data security practices that led to the Cambridge Analytica data misappropriation, and fail to disclose or notify users of the data misappropriation.

104.   The 2017 Proxy, which contained materially misleading statements and thus deprived shareholders of adequate information necessary to make a reasonably informed decision, caused the Company's stockholders to re-elect all of the Defendants to the Board while they were breaching their fiduciary duties to Facebook and deliberately concealing material information concerning the Cambridge Analytica data misappropriation and its effects on the Company's business and reputation.

**VII.   Defendants Zuckerberg, Sandberg, and Koum Trade Upon Material, Non-Public Information to Reap Millions in Profits**

105.   During the Relevant Period, certain of Defendants took advantage of the

artificial inflation of Facebook's shares caused by Defendants' false or misleading statements and omissions that failed to disclose the Cambridge Analytica incident or the nature and extent to which the Company's internal controls and policies had permitted the breach to occur.   Defendants Zuckerberg, Sandberg, and Koum collectively sold or otherwise disposed of nearly $1.5 billion worth of their personally-held shares of Facebook stock during that time, all while in the possession of material, non-public information.   At the time of these stock transactions, all of the Insider Trading Defendants knew about or recklessly disregarded material, non-public information regarding the breach and compromises to user information posed by Facebook's inadequate internal controls described above, but nonetheless sold or otherwise disposed of Facebook common stock on the basis of that information.

106.   Defendant Zuckerberg sold 5,423,200 of his Facebook shares for proceeds of over $978 million, as detailed in the below chart.

| Sale Date | Shares Sold | Price per Share | Total Sale Value |
|---|---|---|---|
| 3/15/18 | 50,354 | 182.8076 | $9,205,093.8904 |
| | 42,146 | 183.5057 | $7,734,031.2322 |
| | 70,380 | 182.8100 | $12,866,167.8000 |
| | 57,120 | 183.5140 | $10,482,319.6800 |
| | 4,700 | 182.8330 | $859,315.1000 |
| | 3,300 | 183.5383 | $605,676.3900 |
| | 6,400 | 182.3660 | $1,167,142.4000 |
| | 2,600 | 183.6315 | $477,441.9000 |
| | 5,790 | 182.9273 | $1,059,149.0670 |
| | 2,610 | 183.5884 | $479,165.7240 |
| | 51,740 | 184.3179 | $9,536,608.1460 |
| | 40,760 | 184.7805 | $7,531,653.1800 |
| | 69,305 | 184.3106 | $12,773,646.1330 |
| | 58,195 | 184.7696 | $10,752,666.8720 |
| 3/14/18 | 38,196 | 182.5204 | $6,971,549.1984 |
| | 39,668 | 183.4088 | $7,275,460.2784 |
| | 14,636 | 183.9882 | $2,692,851.2952 |
| | 54,565 | 182.5391 | $9,960,245.9915 |
| | 55,967 | 183.4711 | $10,268,327.0537 |

| | | | |
|---|---|---|---|
| | 16,968 | 184.0118 | $3,122,312.2224 |
| | 3,700 | 182.5476 | $675,426.1200 |
| | 4,000 | 183.5940 | $734,376.0000 |
| | 300 | 184.0467 | $55,214.0100 |
| | 3,958 | 182.5469 | $722,520.6302 |
| | 4,100 | 183.5156 | $752,413.9600 |
| | 942 | 184.0334 | $173,359.4628 |
| | 4,390 | 182.6240 | $801,719.3600 |
| | 4,010 | 183.7210 | $736,721.2100 |
| 3/13/18 | 39,654 | 181.9159 | $7,213,693.0986 |
| | 25,662 | 182.5314 | $4,684,120.7868 |
| | 12,745 | 183.8776 | $2,343,520.0120 |
| | 8,736 | 184.7237 | $1,613,746.2432 |
| | 5,703 | 185.5784 | $1,058,353.6152 |
| | 61,764 | 181.9615 | $11,238,670.0860 |
| | 29,682 | 182.6152 | $5,420,384.3664 |
| | 17,174 | 183.9100 | $3,158,470.3400 |
| | 11,998 | 184.7779 | $2,216,965.2442 |
| | 6,882 | 185.5838 | $1,277,187.7116 |
| 3/12/18 | 56,259 | 184.9030 | $10,402,457.8770 |
| | 36,241 | 185.5238 | $6,723,568.0358 |
| | 89,526 | 184.9565 | $16,558,415.6190 |
| | 37,974 | 185.6028 | $7,048,080.7272 |
| 3/9/18 | 29,494 | 183.9145 | $5,424,374.2630 |
| | 58,521 | 184.8903 | $10,819,965.2463 |
| | 4,485 | 185.2872 | $831,013.0920 |
| | 42,437 | 183.9401 | $7,805,866.0237 |
| | 81,763 | 184.9082 | $15,118,649.1566 |
| | 3,300 | 185.3174 | $611,547.4200 |
| | 3,100 | 184.0000 | $570,400.0000 |
| | 5,300 | 184.9411 | $980,187.8300 |
| 3/8/18 | 54,344 | 182.1316 | $9,897,759.6704 |
| | 25,064 | 182.7593 | $4,580,679.0952 |
| | 13,092 | 183.8115 | $2,406,460.1580 |
| | 73,627 | 182.1329 | $13,409,899.0283 |
| | 36,710 | 182.7412 | $6,708,429.4520 |
| | 17,163 | 183.8567 | $3,155,532.5421 |
| | 5,600 | 182.1983 | $1,020,310.4800 |
| | 2,100 | 183.2005 | $384,721.0500 |
| | 700 | 184.0421 | $128,829.4700 |

| | | | |
|---|---|---|---|
| 3/6/18 | 33,070 | 179.7218 | $5,943,399.9260 |
| | 36,552 | 180.6023 | $6,601,375.2696 |
| | 21,388 | 181.6404 | $3,884,924.8752 |
| | 1,490 | 182.2221 | $271,510.9290 |
| | 47,648 | 179.7348 | $8,564,003.7504 |
| | 50,649 | 180.6427 | $9,149,372.1123 |
| | 28,003 | 181.6809 | $5,087,610.2427 |
| | 1,200 | 182.2583 | $218,709.9600 |
| 3/5/18 | 14,000 | 176.5458 | $2,471,641.2000 |
| | 14,800 | 177.3944 | $2,625,437.1200 |
| | 7,119 | 178.4443 | $1,270,344.9717 |
| | 15,949 | 179.7159 | $2,866,288.8891 |
| | 39,432 | 180.5252 | $7,118,469.6864 |
| | 1,200 | 181.0560 | $217,267.2000 |
| | 17,817 | 176.5469 | $3,145,536.1173 |
| | 21,159 | 177.3920 | $3,753,437.3280 |
| | 9,392 | 178.3785 | $1,675,330.8720 |
| | 18,928 | 179.6271 | $3,399,981.7488 |
| | 56,204 | 180.4681 | $10,143,029.0924 |
| | 4,000 | 181.0275 | $724,110.0000 |
| 3/7/18 | 8,400 | 178.7554 | $1,501,545.3600 |
| | 14,400 | 179.5805 | $2,585,959.2000 |
| | 19,000 | 180.6881 | $3,433,073.9000 |
| | 18,354 | 181.6478 | $3,333,963.7212 |
| | 14,600 | 182.6832 | $2,667,174.7200 |
| | 17,746 | 183.4958 | $3,256,316.4668 |
| | 10,110 | 178.7595 | $1,807,258.5450 |
| | 19,266 | 179.5193 | $3,458,618.8338 |
| | 28,070 | 180.6818 | $5,071,738.1260 |
| | 25,683 | 181.6701 | $4,665,833.1783 |
| | 21,590 | 182.7483 | $3,945,535.7970 |
| | 22,781 | 183.5253 | $4,180,889.8593 |
| 3/2/18 | 11,701 | 173.5466 | $2,030,668.7666 |
| | 8,300 | 174.4131 | $1,447,628.7300 |
| | 61,979 | 175.3922 | $10,870,633.1638 |
| | 10,220 | 176.4224 | $1,803,036.9280 |
| | 300 | 177.0900 | $53,127.0000 |
| | 33,350 | 173.5871 | $5,789,129.7850 |
| | 26,100 | 174.5257 | $4,555,120.7700 |
| | 56,678 | 175.4589 | $9,944,659.5342 |

| | | | |
|---|---|---|---|
| | | 11,072 | 176.3910 | $1,953,001.1520 |
| | | 300 | 177.0833 | $53,124.9900 |
| | 3/1/18 | 13,200 | 175.3678 | $2,314,854.9600 |
| | | 26,557 | 176.0592 | $4,675,604.1744 |
| | | 23,162 | 177.2413 | $4,105,262.9906 |
| | | 21,141 | 177.9807 | $3,762,689.9787 |
| | | 7,840 | 179.0141 | $1,403,470.5440 |
| | | 600 | 179.8733 | $107,923.9800 |
| | | 14,331 | 175.2523 | $2,511,540.7113 |
| | | 40,198 | 175.9982 | $7,074,775.6436 |
| | | 27,234 | 177.1312 | $4,823,991.1008 |
| | | 33,637 | 177.8752 | $5,983,188.1024 |
| | | 10,800 | 178.9037 | $1,932,159.9600 |
| | | 1,300 | 179.8477 | $233,802.0100 |
| | | 1,990 | 175.5253 | $349,295.3470 |
| | | 1,800 | 176.3161 | $317,368.9800 |
| | | 3,110 | 177.5659 | $552,229.9490 |
| | | 1,000 | 178.6820 | $178,682.0000 |
| | | 100 | 179.1500 | $17,915.0000 |
| | | 2,000 | 175.4565 | $350,913.0000 |
| | | 2,300 | 176.2939 | $405,475.9700 |
| | | 2,800 | 177.5057 | $497,015.9600 |
| | | 1,400 | 178.3079 | $249,631.0600 |
| | | 500 | 179.0720 | $89,536.0000 |
| | | 1,100 | 175.2491 | $192,774.0100 |
| | | 2,600 | 176.0169 | $457,643.9400 |
| | | 1,900 | 177.2800 | $336,832.0000 |
| | | 2,160 | 177.9768 | $384,429.8880 |
| | | 640 | 179.0466 | $114,589.8240 |
| | 2/28/18 | 5,720 | 178.6855 | $1,022,081.0600 |
| | | 12,200 | 180.1273 | $2,197,553.0600 |
| | | 21,709 | 181.3715 | $3,937,393.8935 |
| | | 49,471 | 182.0677 | $9,007,071.1867 |
| | | 3,400 | 182.7041 | $621,193.9400 |
| | | 8,340 | 178.7068 | $1,490,414.7120 |
| | | 18,968 | 180.1772 | $3,417,601.1296 |
| | | 32,808 | 181.4623 | $5,953,415.1384 |
| | | 64,584 | 182.1070 | $11,761,198.4880 |
| | | 2,800 | 182.7807 | $511,785.9600 |
| | | 475 | 178.7205 | $84,892.2375 |

Shareholder Derivative Complaint

| | | | |
|---|---|---|---|
| | 1,100 | 180.2350 | $198,258.5000 |
| | 3,900 | 181.6490 | $708,431.1000 |
| | 2,525 | 182.3432 | $460,416.5800 |
| | 513 | 178.7347 | $91,690.9011 |
| | 1,400 | 180.2050 | $252,287.0000 |
| | 4,587 | 181.6775 | $833,354.6925 |
| | 2,500 | 182.3860 | $455,965.0000 |
| | 473 | 178.6834 | $84,517.2482 |
| | 1,220 | 180.1543 | $219,788.2460 |
| | 4,007 | 181.6353 | $727,812.6471 |
| | 2,700 | 182.3452 | $492,332.0400 |
| 2/27/18 | 25,908 | 182.0866 | $4,717,499.6328 |
| | 39,523 | 182.9557 | $7,230,958.1311 |
| | 26,669 | 183.9030 | $4,904,509.1070 |
| | 400 | 184.5700 | $73,828.0000 |
| | 37,767 | 182.0902 | $6,877,000.5834 |
| | 53,210 | 182.9343 | $9,733,934.1030 |
| | 35,623 | 183.8542 | $6,549,438.1666 |
| | 900 | 184.5744 | $166,116.9600 |
| 2/26/18 | 14,641 | 183.9772 | $2,693,610.1852 |
| | 72,443 | 184.7040 | $13,380,511.8720 |
| | 5,416 | 185.4171 | $1,004,219.0136 |
| | 25,546 | 184.0579 | $4,701,943.1134 |
| | 96,054 | 184.7340 | $17,744,439.6360 |
| | 5,900 | 185.4402 | $1,094,097.1800 |
| 2/23/18 | 8,800 | 180.2089 | $1,585,838.3200 |
| | 28,821 | 181.2932 | $5,225,051.3172 |
| | 34,964 | 182.1698 | $6,369,384.8872 |
| | 19,915 | 182.9340 | $3,643,130.6100 |
| | 10,900 | 180.2267 | $1,964,471.0300 |
| | 35,833 | 181.2519 | $6,494,799.3327 |
| | 49,921 | 182.0920 | $9,090,214.7320 |
| | 30,846 | 182.9089 | $5,642,007.9294 |
| 2/22/18 | 21,650 | 178.1707 | $3,857,395.6550 |
| | 45,073 | 178.9453 | $8,065,601.5069 |
| | 25,777 | 179.7782 | $4,634,142.6614 |
| | 29,139 | 178.1500 | $5,191,112.8500 |
| | 65,795 | 178.9516 | $11,774,120.5220 |
| | 32,566 | 179.7975 | $5,855,285.3850 |
| | 2,800 | 178.2914 | $499,215.9200 |

| | | | |
|---|---|---|---|
| | | 3,500 | 179.0542 | $626,689.7000 |
| | | 2,100 | 179.8377 | $377,659.1700 |
| | 2/21/18 | 15,205 | 176.9175 | $2,690,030.5875 |
| | | 9,174 | 178.1222 | $1,634,093.0628 |
| | | 28,682 | 178.9320 | $5,132,127.6240 |
| | | 27,523 | 180.0341 | $4,955,078.5343 |
| | | 11,916 | 180.7430 | $2,153,733.5880 |
| | | 20,527 | 176.9389 | $3,632,024.8003 |
| | | 14,421 | 178.2019 | $2,569,849.5999 |
| | | 40,904 | 178.9892 | $7,321,374.2368 |
| | | 37,249 | 180.1081 | $6,708,846.6169 |
| | | 14,399 | 180.8002 | $2,603,342.0798 |
| | | 1,600 | 176.8735 | $282,997.6000 |
| | | 1,700 | 178.4194 | $303,312.9800 |
| | | 2,200 | 179.2995 | $394,458.9000 |
| | | 2,700 | 180.3337 | $486,900.9900 |
| | | 200 | 181.0650 | $36,213.0000 |
| | 2/20/18 | 30,189 | 175.6975 | $5,304,131.8275 |
| | | 40,663 | 176.6435 | $7,182,854.6405 |
| | | 21,648 | 177.4202 | $3,840,792.4896 |
| | | 39,106 | 175.6746 | $6,869,930.9076 |
| | | 57,651 | 176.6324 | $10,183,034.4924 |
| | | 30,743 | 177.4187 | $5,454,383.0941 |
| | 2/16/18 | 29,844 | 177.1036 | $5,285,479.8384 |
| | | 22,202 | 178.1515 | $3,955,319.6030 |
| | | 36,554 | 178.8717 | $6,538,476.1218 |
| | | 3,900 | 179.6693 | $700,710.2700 |
| | | 38,569 | 177.0706 | $6,829,435.9714 |
| | | 30,828 | 178.0474 | $5,488,845.2472 |
| | | 53,003 | 178.8491 | $9,479,538.8473 |
| | | 5,100 | 179.6408 | $916,168.0800 |
| | | 2,893 | 177.1733 | $512,562.3569 |
| | | 2,900 | 178.4266 | $517,437.1400 |
| | | 2,107 | 179.0808 | $377,323.2456 |
| | | 100 | 179.7800 | $17,978.0000 |
| | | 2,900 | 177.0914 | $513,565.0600 |
| | | 2,200 | 178.1541 | $391,939.0200 |
| | | 3,600 | 178.8794 | $643,965.8400 |
| | | 300 | 179.6800 | $53,904.0000 |
| | | 2,400 | 177.0367 | $424,888.0800 |

Shareholder Derivative Complaint                                    34

| | | | |
|---|---|---|---|
| 1 | | 1,700 | 177.8888 | $302,410.9600 |
| | | 3,600 | 178.7918 | $643,650.4800 |
| 2 | | 700 | 179.5243 | $125,667.0100 |
| 3 | 2/15/18 | 8,008 | 177.5645 | $1,421,936.5160 |
| 4 | | 37,059 | 178.4507 | $6,613,204.4913 |
| | | 44,233 | 179.4053 | $7,935,634.6349 |
| 5 | | 3,200 | 180.3313 | $577,060.1600 |
| 6 | | 10,931 | 177.5704 | $1,941,022.0424 |
| | | 48,442 | 178.4164 | $8,642,847.2488 |
| 7 | | 63,662 | 179.3809 | $11,419,746.8558 |
| 8 | | 4,465 | 180.2660 | $804,887.6900 |
| | | 1,500 | 177.8893 | $266,833.9500 |
| 9 | | 3,650 | 178.8003 | $652,621.0950 |
| 10 | | 2,650 | 179.5852 | $475,900.7800 |
| | | 200 | 180.3650 | $36,073.0000 |
| 11 | | 1,600 | 177.8963 | $284,634.0800 |
| 12 | | 4,200 | 178.8908 | $751,341.3600 |
| | | 2,800 | 179.5896 | $502,850.8800 |
| 13 | | 400 | 180.3575 | $72,143.0000 |
| 14 | | 1,400 | 177.7736 | $248,883.0400 |
| | | 2,900 | 178.5521 | $517,801.0900 |
| 15 | | 3,694 | 179.4291 | $662,811.0954 |
| 16 | | 406 | 180.3357 | $73,216.2942 |
| 17 | 2/14/18 | 1,772 | 173.4880 | $307,420.7360 |
| | | 14,005 | 174.9678 | $2,450,424.0390 |
| 18 | | 5,200 | 175.7685 | $913,996.2000 |
| 19 | | 24,400 | 176.9588 | $4,317,794.7200 |
| | | 16,798 | 178.0848 | $2,991,468.4704 |
| 20 | | 25,355 | 179.1175 | $4,541,524.2125 |
| 21 | | 4,970 | 179.6034 | $892,628.8980 |
| | | 3,836 | 173.6151 | $665,987.5236 |
| 22 | | 20,612 | 174.8769 | $3,604,562.6628 |
| 23 | | 7,209 | 175.8668 | $1,267,823.7612 |
| 24 | | 35,202 | 176.9656 | $6,229,543.0512 |
| | | 20,777 | 178.0790 | $3,699,947.3830 |
| 25 | | 31,019 | 179.0714 | $5,554,615.7566 |
| 26 | | 8,845 | 179.5662 | $1,588,263.0390 |
| 27 | 2/13/18 | 8,117 | 173.8951 | $1,411,506.5267 |
| | | 50,133 | 174.7686 | $8,761,674.2238 |
| 28 | | 1,500 | 175.3860 | $263,079.0000 |

Shareholder Derivative Complaint                                                    35

| | 23,863 | 173.8930 | $4,149,608.6590 |
|---|---|---|---|
| | 89,802 | 174.5992 | $15,679,357.3584 |
| | 3,785 | 175.3731 | $663,787.1835 |
| 2/12/18 | 2,100 | 172.6457 | $362,555.9700 |
| | 5,100 | 173.5538 | $885,124.3800 |
| | 20,000 | 174.8800 | $3,497,600.0000 |
| | 25,025 | 175.5967 | $4,394,307.4175 |
| | 34,120 | 176.7343 | $6,030,174.3160 |
| | 6,155 | 177.2683 | $1,091,086.3865 |
| | 4,400 | 172.4355 | $758,716.2000 |
| | 13,693 | 173.3643 | $2,373,877.3599 |
| | 17,430 | 174.3833 | $3,039,500.9190 |
| | 38,335 | 175.3712 | $6,722,854.9520 |
| | 29,372 | 176.4228 | $5,181,890.4816 |
| | 24,270 | 177.0925 | $4,298,034.9750 |
| TOTAL NUMBER OF SHARES | 5,423,200 | TOTAL VALUE OF SHARES | $978,496,893.8126 |

107.   Defendant Sandberg sold 196,684 of her Facebook shares for proceeds of over $35 million, as detailed in the below chart.

| Sale Date | Shares Sold | Price per Share | Total Sale Value |
|---|---|---|---|
| 2/14/2018 | 1,900 | 173.4588 | $329,571.72 |
| 2/14/2018 | 10,900 | 174.9736 | $1,907,212.24 |
| 2/14/2018 | 6,300 | 176.5354 | $1,112,173.02 |
| 2/14/2018 | 12,525 | 177.1428 | $2,218,713.57 |
| 2/14/2018 | 10,500 | 178.3241 | $1,872,403.05 |
| 2/14/2018 | 12,875 | 179.3158 | $2,308,690.93 |
| 2/15/2018 | 17,038 | 179.5200 | $3,058,661.76 |
| 2/15/2018 | 6,461 | 179.5200 | $1,159,878.72 |
| 2/15/2018 | 8,185 | 179.5200 | $1,469,371.20 |
| 3/2/2018 | 18,200 | 173.6200 | $3,159,884.00 |
| 3/2/2018 | 11,080 | 174.5121 | $1,933,594.07 |
| 3/2/2018 | 22,236 | 175.4910 | $3,902,217.88 |
| 3/2/2018 | 3,484 | 176.4824 | $614,864.68 |
| 3/15/2018 | 28,866 | 182.7890 | $5,276,387.27 |
| 3/15/2018 | 26,134 | 183.5057 | $4,795,737.96 |

| TOTAL NUMBER OF SHARES | 196,684 | TOTAL VALUE OF SHARES | $35,119,362.07 |

108.   Defendant Koum sold 2,485,347 of his Facebook shares for proceeds of over $442 million, as detailed in the below chart.

| Sale Date | Shares Sold | Price per Share | Total Sale Value |
|---|---|---|---|
| 2/15/2018 | 1,231,441 | 179.5200 | $221,068,288.32 |
| 2/15/2018 | 371,500 | 175.6494 | $65,253,752.10 |
| 2/20/2018 | 580,736 | 176.5977 | $102,556,641.91 |
| 2/20/2018 | 301,670 | 177.4104 | $53,519,395.37 |
| TOTAL NUMBER OF SHARES | 2,485,347 | TOTAL VALUE OF SHARES | $442,398,077.70 |

## THE INDIVIDUAL DEFENDANTS' FIDUCIARY DUTIES

### I.   General Duties as Directors and Officers

109.   By reason of their positions as Facebook's officers and directors and because of their ability to control Facebook's business and corporate affairs, the Individual Defendants owed Facebook and its shareholders fiduciary obligations of trust, loyalty, good faith, candor, and due care, and were required to use their utmost ability to control and manage Facebook in a fair, just, honest, and equitable manner. The Individual Defendants were required to act in furtherance of the best interests of Facebook and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interests or benefit.

110.   Each director and officer owes to Facebook and its shareholders the fiduciary duty to exercise good faith and diligence, as well as the highest obligations of loyalty and fair dealing, in the administration of Facebook affairs and in the use and preservation of its property and assets.

111.   The Individual Defendants, because of their positions of control and authority as Facebook's directors and officers, were able to and did directly and/or indirectly, exercise control over the misconduct complained of herein.

Shareholder Derivative Complaint                                      37

112.   To discharge their duties as Facebook's officers and directors, the Individual Defendants were required to exercise reasonable and prudent supervision over Facebook's management, policies, practices, and controls of the affairs of the Company.  Accordingly, the Individual Defendants were required to:

a.   Manage, conduct, supervise, and direct the employees, businesses, and affairs of Facebook in accordance with laws, rules, and regulations, as well as the charter and by-laws of Facebook;

b.   Ensure that Facebook did not engage in imprudent or unlawful practices and that the Company complied with all applicable laws and regulations;

c.   Remain informed as to how Facebook was, in fact, operating, and, upon receiving notice or information of imprudent or unsound practices, to take reasonable corrective and preventative actions, including maintaining and implementing adequate financial and operational controls;

d.   Supervise the preparation, filing, or dissemination of any SEC filings, press releases, audits, reports, or other information disseminated by Facebook, and to examine and evaluate any reports of examinations or investigations concerning the practices, products, or conduct of officers of the Company;

e.   Preserve and enhance Facebook's reputation as befits a public corporation;

f.   Exercise good faith to ensure that the affairs of the Company were conducted in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business; and

g.   Refrain from unduly benefiting themselves and other Facebook insiders at the expense of the Company.

113.   As senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and

traded on NASDAQ, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to the Company's operations, business, products, management, and present and future business prospects; and to correct any previously-issued statements that had become materially misleading or untrue, so that the market price of the Company's common stock would be based upon truthful and accurate information.  The Individual Defendants' misrepresentations and omissions during the Relevant Period violated these specific requirements and obligations.

## II.   The Duty of Reasonable and Prudent Supervision

114.   The Individual Defendants are required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company.  By virtue of such duties, the Individual Defendants are required to, among other things:

a.   refrain from acting upon material inside corporate information to benefit themselves;

b.   ensure that Facebook complies with its legal obligations and requirements, including timely notifying its customers of material data misappropriations and security vulnerabilities in its products and disseminating truthful and accurate statements to the investing public;

c.   conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

d.   properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's financial results and compliance with the law;

e.   remain informed as to how Facebook conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to

correct such conditions or practices and make such disclosures as necessary to comply with applicable laws; and

f.   ensure that Facebook was operated in a diligent, honest, and prudent manner in compliance with all applicable laws, rules, and regulations.

## BREACHES OF FIDUCIARY DUTIES

115.   Each Individual Defendant owed to Facebook and to its shareholders the fiduciary duty of loyalty and good faith, and the exercise of due care and diligence in managing and overseeing Facebook's affairs, as well as in the use and preservation of its property and assets.  The Individual Defendants' misconduct involves a knowing and culpable violation of their obligations as directors and officers of Facebook, the absence of good faith on their part, or a reckless disregard of their duties that they were aware or should have been aware posed a risk of serious injury to Facebook.  Each Individual Defendant ratified each other's misconduct because they collectively comprised Facebook's Board at all relevant times.

116.   The Individual Defendants each breached their duties of loyalty and good faith by allowing Defendants to cause, or by themselves causing, the Company to make false and/or misleading statements and/or failing to disclose the Cambridge Analytica data misappropriation.

117.   In addition, the Individual Defendants breached their duties of loyalty and good faith to the Company by failing to prevent the insider trading by Defendants Zuckerberg, Sandberg, and Koum.

118.   In addition, as a result of the Individual Defendants' actions and course of conduct, the Company is now the subject of customer and investor lawsuits.  As a result, Facebook has expended, and will continue to expend, significant sums of money to rectify the Individual Defendants' wrongdoing.

## CONTROL, ACCESS, AND AUTHORITY

119.   The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful

acts complained of herein, as well as the contents of the various public statements issued by Facebook.

120.    Because of their advisory, executive, managerial, and directorial positions with Facebook, each of the Individual Defendants had access to adverse, non-public information about the financial condition, operations, and improper representations of Facebook.

121.    Each of the Individual Defendants was the agent of each of the other Defendants and of Facebook, and was at all times acting within the course and scope of such agency.

**CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION**

122.    In committing the wrongful acts alleged herein, Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing.  Defendants further aided and abetted or assisted each other in breaching their respective duties.

123.    During the Relevant Period, the Individual Defendants collectively and individually initiated a course of conduct that was designed to and did conceal the fact of the Cambridge Analytica data misappropriation.  In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein.

124.    The Individual Defendants engaged in a conspiracy, common enterprise, and/or common course of conduct.  The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing Facebook to conceal from Facebook's users and the investing public the existence of the Cambridge Analytica data misappropriation.  Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

125.    The purpose and effect of the Defendants' conspiracy, common enterprise,

and/or common course of conduct was, among other things, to conceal from its customers and shareholders the material vulnerabilities on Facebook's platform as well as the fact that personal user data of 50 million Facebook users was compromised.

126.   Each Individual Defendant aided and abetted and rendered substantial assistance in the wrongs complained of herein.  In taking such actions to substantially assist the commissions of the wrongdoing complained of herein, each Individual Defendant acted with knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and was aware of his (or her) overall contribution to and furtherance of the wrongdoing.

## DAMAGES TO FACEBOOK

127.   The Individual Defendants' misconduct has caused extreme reputational damage to the Company.  This is especially harmful to Facebook because the Company is built on customer trust.  The Individual Defendants clearly breached this trust by acting in direct contravention of the Company's publicly-touted representations.  This reputational harm has resulted in long-term damage to the Company.

128.   The illegal practices and the Individual Defendants' gross failures to timely address, remedy, or disclose them also severely damaged Facebook's reputation within the business community and in the capital markets, as evidenced by, for example, the more than $50 billion loss in market capitalization after the Cambridge Analytica data misappropriation — and the Individual Defendants' knowledge of or conscious disregard of it — were revealed.

129.   Further, Facebook's customers and current and potential investors expect the Company to safeguard its users' personal information and to implement adequate controls to ensure that practices that violate user privacy are timely discovered and properly addressed.  Customers are less likely to use websites that knowingly permit or encourage unscrupulous behavior, and investors are less likely to invest in companies that lack internal controls and fail to timely disclose material information.  Facebook's ability to attract users and investors is now impaired.

130.    Further, as a direct and proximate result of Defendants' actions, Facebook has expended and will continue to expend significant additional money, including: (a) costs incurred in defending against, and the potential settlement of, civil and criminal lawsuits brought against the Company related to the unauthorized sharing and use of users' personal information; and (b) costs incurred from the substantial compensation and benefits paid to Defendants, who are responsible for the scheme.

## DERIVATIVE ALLEGATIONS

131.    Plaintiff brings this action for the benefit of Facebook to redress injuries suffered as a result of the Individual Defendants' breaches of fiduciary duties and violations of federal and state laws.

132.    Facebook is named solely as a nominal defendant.  This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

133.    Plaintiff is and has continually been a Facebook shareholder during the entire period of wrongdoing alleged herein.  Plaintiff therefore will adequately and fairly represent the interests of Facebook in enforcing and prosecuting its rights.

134.    Facebook's Board at the time this action was initiated consisted of the following nine directors:  Zuckerberg, Sandberg, Andreessen, Desmond-Hellmann, Hastings, Bowels, Thiel, Koum, and Kenneth Chenault.  Plaintiff has not made any demand on the Board to institute this action against the Individual Defendants because, for the reasons set forth below, such demand would be a futile and useless act.

## I.    Demand Is Excused Because the Individual Defendants' Conduct Did Not Constitute a Valid Exercise of Business Judgment

135.    Plaintiff did not make a demand on the Board prior to instituting this action because any demand would have been a wasteful and futile act, and therefore demand is futile.  The wrongful acts complained of herein evidence a pattern of conduct showing a wholesale abandonment of Defendants' fiduciary duties.  Those acts, which are detailed above, include, *inter alia*:  (a) maintaining policies that allowed app developers to access user information without their knowledge and informed consent;

(b) allowing Facebook insiders to engage in insider selling while in possession of material, non-public information relating to the Cambridge Analytica data misappropriation; (c) maintaining woefully inadequate internal controls over the Company's disclosures and notification procedures, corporate governance, and risk monitoring, which allowed the unauthorized information sharing to persist for years, and allowed the Insider Trading Defendants to sell millions of dollars' worth of their Facebook stock at prices that were artificially inflated due to Defendants' misconduct; and (d) causing Facebook to file materially false and misleading SEC filings.

136.    These acts, and the other improper acts set forth in this Complaint, which demonstrate a pattern of misconduct, were not the product of a valid or good faith exercise of business judgment.

137.    Defendants' misconduct at the heart of this case constitutes the direct facilitation of violations of federal, state, and international laws, including knowingly and consciously presiding over the Company's systematic deficiencies and unsound user privacy practices, as well as concealing Facebook's involvement in the illicit scheme.  Among other things, the Individual Defendants made, or caused Facebook to make, materially false or misleading statements, including in the 2017 Proxy.

138.    Defendants' blatant and repeated disregard of their responsibility to safeguard the Company against wrongdoing indicate they knowingly adopted, endorsed, or condoned a business strategy that incorporated the illicit sharing of personal user information without users' knowledge or consent, which cannot be considered a legitimate exercise of business judgment.  Demand is therefore excused.

## II.    Demand Is Excused Because the Individual Defendants Face a Substantial Likelihood of Liability Due to Their Knowledge or Conscious Disregard of Facts Relating to the Illicit Practices

139.    Demand is also excused because the Individual Defendants face a substantial likelihood of liability for the claims alleged against them in this complaint, given their awareness or conscious disregard of significant red flags relating to the illicit practices which allowed misappropriation of personal user information.

140.   The Individual Defendants were aware of the weaknesses of Facebook's user privacy controls and data security but failed to address and repair them.   In particular, the Individual Defendants had affirmative obligations to oversee Facebook's compliance with the 2011 consent order entered into with the FTC.

141.   Section VII of the Consent Order provides, in relevant part, that "[Facebook] shall deliver a copy of this order to all current and future principals, officers, directors, and managers; (2) all current and future employees, agents, and representatives having supervisory responsibilities relating to the subject matter of this order, and (3) any business entity resulting from any change in structure ... . [Facebook] shall deliver this order to such current personnel within thirty (30) days after service of this order, and to such future personnel within thirty (30) days after the person assumes such position or responsibilities."

142.   All the Individual Defendants received the Consent Order, pursuant to Section VII, and therefore had knowledge of the issues addressed therein and the Company's affirmative obligations under the agreement.   Yet, the Individual Defendants failed to act to ensure the Company complied with the Consent Order.

143.   The members of the Audit Committee consciously ignored their obligations as provided in the Audit Committee Charter, in addition to their duties imposed by law, because despite the numerous lawsuits, investigations, and reports asserting fundamental failings in the Company's internal controls, they did not cause Facebook to remediate those control deficiencies.   The Audit Committee's deliberate failure of oversight constituted breaches of their fiduciary duties to Facebook and has resulted in significant harm to the Company.

144.   Further, the Audit Committee members were charged with ensuring the integrity of the Company's financial statements and the adequacy and reliability of disclosures to its stockholders, including the Company's internal controls.   By approving false financial statements and the false 2017 Proxy, the Audit Committee members breached their fiduciary duties of candor and loyalty.

145.    But Facebook's internal and disclosure controls were deficient, causing Facebook to issue materially false and misleading information regarding the Company's sharing of private user information. The Audit Committee was directly responsible for approving the Company's materially false and misleading 2017 Proxy.

146.    Accordingly, there is significant doubt that the Individual Defendants are disinterested because they face a substantial likelihood of liability for their breaches of fiduciary duties, including their duties of good faith, fair dealing, and loyalty, as well as other violations of law.

147.    Given their membership on the Audit Committee and/or the Compensation & Governance Committee, their respective responsibilities, and their failures to meet them, the Individual Defendants face a substantial likelihood of liability for the misconduct alleged in this Complaint, thus excusing the demand.

148.    The entire Board had the duty to ensure Facebook's systems were sufficiently well-designed to protect user information and detect suspicious activity at the developer level with respect to same.  The Board's duty was heightened by the fact that the FTC imposed affirmative obligations with respect to the Company's user privacy practices in the 2011 Consent Order.

149.    The Board failed to fulfill that duty, and its failure is even more egregious in light of the many "red flag" warnings both before and during the Relevant Period that Facebook's systems were not sufficient to address the misconduct at issue in this Complaint.   Given the Board's awareness and deliberate concealment of the data misappropriation from the public, and Facebook's failure to notify affected users in accordance with applicable statutes — wrongful actions that resulted in the retention and unauthorized use of personal user information of 50 million users for over several years — it is clear the Board either deliberately or recklessly failed to take remedial actions to stop the practices that allowed the illicit scheme to continue.

150.    For these reasons, the Board is incapable or unwilling to take the actions required to seek the relief requested in this Complaint.  Because a majority of the Board

Shareholder Derivative Complaint                                                                46

faces a substantial risk of personal liability, demand is futile.

151. The Individual Defendants' failure to meet their fiduciary obligations also allowed certain Facebook insiders to reap unlawful profits from selling or disposing of Facebook shares at artificially-inflated prices.

152. All the Individual Defendants failed to exercise any oversight over the insider sales transactions and failed to implement reasonable internal controls with respect to same. Accordingly, a clear majority of the Board is unable to consider a demand to investigate Plaintiff's allegations that Defendants breached their fiduciary duties and artificially inflated the Company's stock price for their own personal gain and that the Insider Trading Defendants engaged in illegal insider selling of Company stock. The Individual Defendants cannot investigate allegations of Defendants' wrongdoing in a disinterested and independent manner.

153. In light of the foregoing facts, the Individual Defendants face a substantial likelihood of liability in this case, thus rendering demand on them futile.

## III. Demand Is Excused Because the Board Is "Controlled" by Defendant Zuckerberg and, thus, the Board Lacks Independence

154. Demand is futile because the Board is dominated and controlled by Zuckerberg, who controls 59.7% of the voting power of the Company's outstanding stock, and thus has majority voting power over all aspects of the Company.

155. The following chart reflects Zuckerberg's current ownership and voting control over the Company:

| Name of Beneficial Owner | Shares Beneficially Owned | | | | % of Total Voting Power[1] |
|---|---|---|---|---|---|
| | Class A | | Class B | | |
| | Shares | % | Shares | % | |
| **Named Executive Officers and Directors:** | | | | | |
| Mark Zuckerberg[2] | 2,627,554 | * | 410,758,857 | 77.0 | 53.4 |
| Shares subject to voting proxy[3] | — | * | 48,892,913 | 9.2 | 6.3 |
| Total[2][3] | 2,627,554 | * | 459,651,770 | 86.1 | 59.7 |
| Sheryl K. Sandberg[4] | 2,263,083 | * | 1,834,104 | * | * |
| David M. Wehner[5] | 131,211 | * | — | * | * |
| Christopher K. Cox[6] | 303,362 | * | 203,398 | * | * |
| Mike Schroepfer[7] | 628,400 | * | 1,598,951 | * | * |

| | | | | | |
|---|---|---|---|---|---|
| Marc L. Andreessen[8] | 175,165 | * | 379,429 | * | * |
| Erskine B. Bowles[9] | 39,046 | * | — | * | * |
| Susan D. Desmond-Hellmann[10] | 27,366 | * | — | * | * |
| Reed Hastings[11] | 133,454 | * | — | * | * |
| Jan Koum[12] | 28,717,925 | 1.2 | — | * | * |
| Peter A. Thiel[13] | 220,718 | * | 54,995 | * | * |
| All executive officers and directors as a group (13 persons)[14] | 35,569,204 | 1.5 | 463,764,105 | 86.3 | 60.4 |

156.    In fact, to ensure Zuckerberg's voting control over the Company, the Board consistently recommended to shareholders, at annual meetings in 2014, 2015, 2016, and 2017, to vote against shareholder proposals that were designed to reduce Zuckerberg's voting power by adopting a one-vote-per-share policy.

157.    Moreover, the Company admits in its SEC filings that Facebook is a "controlled company," with Defendant Zuckerberg possessing the controlling power. According to Facebook's 2017 Proxy:

> Because Mr. Zuckerberg controls a majority of our outstanding voting power, *we are a "controlled company"* under the corporate governance rules of the NASDAQ Stock Market LLC (NASDAQ). Therefore, *we are not required to have a majority of our board of directors be independent*, nor are we required to have a compensation committee or an independent nominating function.  In light of our status as a controlled company, our board of directors has determined not to have an independent nominating function and to have the full board of directors be directly responsible for nominating members of our board.

158.    Demand is futile and therefore excused as to the entire Board because of Zuckerberg's domination and control of the voting power of the Company, and thus the Board.  Due to his majority and controlling voting power, Zuckerberg can replace the entire Board if he so chooses.  The Board thus lacks independence from Zuckerberg.

159.    Defendants Andreessen and Thiel lack independence from Zuckerberg and have demonstrated personal bias in favor of keeping founders in control of the companies they created.

160.    For Andreessen, this bias is deep-rooted in his own experience.  When he and his partner, Ben Horowitz, were trying to get Loudcloud, a company that they co-

founded on its feet, the venture capitalist providing their funding advised Horowitz to cut Andreessen out of the project altogether.  Andreessen is still so resentful about that experience that when he and Horowitz founded their own venture capital firm, Andreessen Horowitz, they "set out to design a venture capital firm that would enable founders to run their own companies" without interference from the financial backers.

161.   Andreessen lacks independence from Zuckerberg for the additional reason that his association with Zuckerberg has led Andreessen and his firm to some highly lucrative deals in the past few years.  Specifically, Andreessen Horowitz has seen two of its portfolio companies purchased by Facebook — Instagram and Oculus VR.

162.   Andreessen turned his firm's $250,000 investment in Instagram into $78 million when the $1 billion acquisition by Facebook closed.

163.   Andreessen also would not have even been able to invest in Oculus VR without Zuckerberg.  Andreessen had declined to invest in the company previously, but desperately wanted in by the fall of 2013, according to an October 2015 *Vanity Fair* article.  When Oculus VR's CEO seemed reluctant to allow the investment, Andreessen had Zuckerberg talk to the CEO.  As a result, Andreessen Horowitz got the deal and Andreessen became one of four board members for the fledgling company.  Not very long after, Zuckerberg offered $2 billion for Facebook to acquire Oculus VR.

164.   Andreessen knows that his firm's access to the best investments — its "deal flow" — relies heavily on his relationship with Zuckerberg and Facebook.  In a May 18, 2015 *New Yorker* article titled "*Tomorrow's Advance Man*," Andreessen is quoted as saying that "Deal flow is everything.  If you're in a second-tier firm, you never get a chance at that great company."  Andreessen Horowitz saw its biggest successes after "logo shopping" to add Facebook to the firm's portfolio in 2010.  Within two years of that investment, "Andreessen Horowitz was the talk of the town."

165.   Defendant Thiel's venture capital fund, The Founders Fund, is marketed on the principle that company founders should have long-term control of the companies they create.  In fact, The Founders Fund's website touts Facebook as a

primary example of that maxim, stating that "we have often tried to ensure that founders can continue to run their businesses through voting control mechanisms, as Peter Thiel did with Mark Zuckerberg and Facebook."

166.   Thiel, like Andreessen, is greatly benefited by his relationship with Zuckerberg and his seat on the Facebook Board.  The Founders Fund gets "good deal flow" from this high profile association.

167.   Defendant Hastings also lacks independence from Zuckerberg.   In addition to being sympathetic to Zuckerberg's desire to maintain founder's control due to his own founder role at Netflix, Hastings has every incentive to cater to Zuckerberg's desires at Facebook due to Facebook's business relationship with Netflix.  Through the "Friends and Community" initiative launched in March 2013, Netflix enjoyed very valuable word-of-mouth marketing because the initiative allows Facebook users to share data about their Netflix viewing habits with their Facebook friends.  Hastings is beholden to Zuckerberg for allowing the illicit scheme concerning the sharing of private user information to go undetected, for he does not want to risk losing this relationship, as the initiative's launch caused Netflix's share price to climb 6%, and displeasing Zuckerberg could mean an end to such valuable data sharing.

168.   Defendant Desmond-Hellmann lacks independence from Zuckerberg due to their close business and personal relationships.  As Lead Independent Director, Desmond-Hellmann serves as a liaison between Zuckerberg and the Board's independent directors.  Desmond-Hellmann is the CEO of The Gates Foundation, which is the philanthropic vehicle of Bill and Melinda Gates (with substantial contributions from Warren Buffett).  Zuckerberg's own philanthropy was inspired by Bill Gates's and Buffett's challenge to other wealthy business executives to follow their lead by donating a significant portion of their wealth to charity.   The Gates Foundation has an endowment from the Gates family and Buffett of approximately $39.6 billion, and as the Foundation's CEO, Desmond-Hellmann determines the priorities for how that endowment gets distributed to grantees.   Desmond-Hellmann is beholden to

Shareholder Derivative Complaint                                                                50

Zuckerberg and would not want to risk losing this relationship, as displeasing Zuckerberg could compromise her position and the personal benefits and positive reputational effects she derives in her position at The Gates Foundation.

**IV.    Demand Is Futile as to Zuckerberg, Sandberg, and Koum**

169.    Under California Corporations Code § 25502.5(c), if any shareholder of an issuer alleges to the board that there has been, *inter alia*, insider trading in violation of Corporations Code § 25402, "the board shall be required to consider the allegations in good faith, and *if the allegation involves misconduct by any director, that director shall not be entitled to vote on any matter involving the allegation*."

170.    Here, Defendants Zuckerberg, Sandberg, and Koum are alleged to have engaged in insider trading in violation of Corporations Code § 25402.

171.    Accordingly, under § 25502.5(c), when the Board considers the above allegations of insider trading, Defendants Zuckerberg, Sandberg, and Koum "shall not be entitled to vote" on whether to initiate a lawsuit concerning such allegations.  Thus, because Defendants Zuckerberg, Sandberg, and Koum are disqualified from considering a demand to institute a derivative action stemming from the allegations that these Defendants engaged in insider trading, demand is futile as to them.

172.    Moreover, demand is futile as to Zuckerberg, Sandberg, and Koum because they are interested.  Zuckerberg, Sandberg, and Koum, as alleged herein, engaged in self-interested transactions with the Company, including engaging in unlawful insider selling while in possession of material, non-public information about the data misappropriation.  They thus breached their duty of loyalty to the Company. Breaches of the duty of loyalty cannot be indemnified.  Zuckerberg, Sandberg, and Koum thus face a substantial likelihood of personal liability, and demand is excused.

/ / /

/ / /

/ / /

/ / /

**CLAIMS FOR RELIEF**

### COUNT I
### Breach of Fiduciary Duty
### (Against All Individual Defendants)

173.    Plaintiff incorporates by reference and re-alleges each of the preceding paragraphs as if fully set forth herein.

174.    Each of the Defendants owed and owes fiduciary duties to Facebook and its stockholders.  By reason of their fiduciary relationships, Defendants specifically owed and owe Facebook the highest obligation of good faith, fair dealing, loyalty, and due care in the administration and management of the affairs of the Company, including the Company's financial reporting, internal controls, and compensation practices.  Each of the Defendants consciously and deliberately breached their fiduciary duties of candor, good faith, loyalty, and reasonable inquiry to Facebook and its stockholders by failing to act to ensure Facebook maintained adequate internal controls to comply with the Consent Order and other applicable laws.

175.    Defendants, individually and in concert, engaged in the above referenced conduct in intentional, reckless, or grossly negligent breaches of the fiduciary duties they owed to Facebook to protect its rights and interests.  In breach of their fiduciary duties owed to Facebook, Defendants willfully participated in material omissions and misrepresentations related to the Company's sharing of personal user information, failed to fully inform themselves prior to making decisions as directors and officers, and failed to correct the Company's public statements, including in the 2017 Proxy, rendering them personally liable to the Company for breaching their fiduciary duties.

176.    Defendants had actual or constructive knowledge that Facebook had improperly misrepresented its user privacy and data security and they failed to correct the Company's public statements. Defendants had actual knowledge of the misstatements and omissions of material facts set forth in this Complaint, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them.  Such material misrepresentations and

omissions were committed knowingly or recklessly.

177.   These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

178.   Additionally, Defendants have affirmative obligations under the FTC Consent Order, as well as specific fiduciary duties as defined by the charters of various Board committees that, had they been discharged in accordance with Defendants' obligations, would have necessarily prevented the misconduct and the consequent harm to the Company alleged in this Complaint.

179.   Defendants' actions detailed herein were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

180.   As a direct and proximate result of Defendants' breaches of their fiduciary obligations, Facebook has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, Defendants are liable to the Company.

**COUNT II**
**Aiding and Abetting Breach of Fiduciary Duty**
**(Against All Individual Defendants)**

181.   Plaintiff incorporates by reference and re-alleges each of the preceding paragraphs as if fully set forth herein.

182.   Each of the Individual Defendants aided and abetted the other Individual Defendants in breaching their fiduciary duties owed to Facebook.

183.   The Individual Defendants owed to Facebook certain fiduciary duties as fully set out herein.  By committing the acts alleged herein, the Individual Defendants breached their fiduciary duties owed to Facebook.

184.   Each of the Individual Defendants colluded in or aided and abetted the other Individual Defendants' breaches of fiduciary duties, and actively and knowingly participated in the other Individual Defendants' breaches of fiduciary duties owed to Facebook.  Each of the Individual Defendants knew about or recklessly disregarded the other Individual Defendants' breaches of fiduciary duty, which were and are continuing, as set forth in particularity herein.

185.   Facebook was injured as a direct and proximate result of the aforementioned acts.

## COUNT III
### Breach of Fiduciary Duty for Insider Selling and Misappropriation of Information
### (Against the Insider Trading Defendants)

186.   Plaintiff incorporates by reference and re-alleges each of the preceding paragraphs as if fully set forth herein.

187.   At the time of the stock sales set forth above, Defendants Zuckerberg, Sandberg, and Koum knew or recklessly disregarded the information described in this Complaint regarding the illicit data sharing and data misappropriation and sold Facebook common stock on the basis of that information.

188.   The information described above was non-public information concerning the Company's unlawful conduct associated with its advertising strategy.   The information was a proprietary asset belonging to the Company, which Defendants used for their own benefit when they sold Facebook common stock.

189.   Defendants' sales of Facebook common stock while in possession and control of this material adverse non-public information was a breach of their fiduciary duties of loyalty and good faith.

190.   Because the use of the Company's proprietary information for their own gain constitutes a breach of Defendants' fiduciary duties, the Company is entitled to the imposition of a constructive trust on any profits the Insider Trading Defendants obtained thereby.

## COUNT IV
### Violation of Section 25402 of the California Corporations Code
### (Against the Insider Trading Defendants)

191.   Plaintiff incorporates by reference and re-alleges each of the foregoing allegations as though fully set forth in this paragraph.

192.   The Insider Trading Defendants — Zuckerberg, Sandberg, and Koum — sold their Facebook common stock as set forth in this Complaint.  By reason of their high executive or directorship positions with Facebook, these Defendants had access to

highly material information regarding the Company, including the information regarding the Company's lax user privacy and data security and the data misappropriation.  Further, the Insider Trading Defendants received millions of dollars of proceeds from trading on material, non-public information, which information was an asset of, and belonged exclusively to, Facebook.

193.    At the time of the Insider Trading Defendants' sales, that information was not generally available to the public or the securities markets.  Had such information been generally available, it would have significantly reduced the market price of Facebook shares at that time.

194.    Each of the Insider Trading Defendants had actual knowledge of material, adverse, non-public information and thus sold their Facebook common stock in California in violation of California Corporations Code § 25402.

195.    Pursuant to California Corporations Code § 25502.5, each of the Insider Trading Defendants is liable to Facebook for damages in an amount up to three times the difference between the price at which the security was purchased or sold and the market value which the security would have had at the time of the purchase or sale if the information known to them had been publicly disseminated prior to that time and a reasonable time had elapsed for the market to absorb the information.

196.    Facebook has total assets in excess of one million dollars and has a class of equity security held of record by 500 or more persons.  As of December 31, 2017, there were 3,967 stockholders of record of Facebook's Class A common stock.

197.    Defendants Zuckerberg, Sandberg, and Koum are also liable for reasonable attorneys' fees and costs under California Corporations Code § 25502.5.

### COUNT V
### Violation of Section 25403 of the California Corporations Code
### (Against All Individual Defendants)

198.    Plaintiff incorporates by reference and re-alleges each of the foregoing allegations as though fully set forth in this paragraph.

199.    Defendants, through their positions, possessed control and influence over

the Insider Trading Defendants' sale of Facebook common stock in violation of the California Corporations Code. Defendants are statutorily liable to the same extent as the Insider Trading Defendants under California Corporations Code § 25403.

200.    Defendants were aware of the Insider Trading Defendants' knowledge of the material adverse non-public information and Defendants were aware of the Insider Trading Defendants' intent to sell Facebook common stock while in possession of material adverse non-public information.

201.    Defendants are culpable for the Insider Trading Defendants' underlying violations of California Corporations Code § 25402 because of their knowledge and ability to control and influence the Insider Trading Defendants and due to their involvement in preparing, approving, and signing the Company's false or misleading Form 10-Ks and Proxy Statements during the Relevant Period.

202.    Under California Corporations Code § 25403, each of the Defendants is liable to Facebook for damages in an amount up to three times the difference between the price at which Facebook common stock was sold by the Defendant and the market value that stock would have had at the time of the sale if the information known to the Defendants had been publicly disseminated prior to that time and a reasonable time had elapsed for the market to absorb the information.

**COUNT VI**
**Violation of Section 14(a) of the Exchange Act and SEC Rule 14a-9**
**(Against All Individual Defendants)**

203.    Plaintiff incorporates by reference and re-alleges each allegation contained above, as though fully set forth herein, except to the extent those allegations plead knowing or reckless conduct by Defendants. This claim is based solely on negligence, not on any allegation of reckless or knowing conduct by or on behalf of Defendants. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to this claim.

204.    SEC Rule 14a-9 (17 C.F.R. § 240.14a-9), promulgated under Section 14(a) of the Exchange Act, provides:

No solicitation subject to this regulation shall be made by means of any proxy statement form of proxy, notice of meeting or other communication, written or oral, containing any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading or necessary to correct any statement in any earlier communication with respect to the solicitation of a proxy for the same meeting or subject matter which has become false or misleading.

205.    Defendants negligently issued, caused to be issued, and participated in the issuance of materially misleading written statements to stockholders that were contained in the 2017 Proxy.   The 2017 Proxy contained proposals to Facebook's stockholders urging them to re-elect the members of the Board and vote against stockholder proposals for the Company to adopt a policy to require the Company to disclose information about the misuse of Facebook's platform.   The 2017 Proxy, however, misstated or failed to disclose the following information, among others:  (a) the deficiencies in Facebook's internal and disclosure controls that were known to the Board when the 2017 Proxy was filed; and (b) the fact that Facebook and Defendants learned of the Cambridge Analytica data misappropriation and knew that Facebook faced significant reputational harm when the truth would inevitably come out.

206.    By reasons of the conduct alleged herein, Defendants violated Section 14(a) of the Exchange Act and SEC Rule 14a-9. As a direct and proximate result of Defendants' wrongful conduct, Facebook misled or deceived its stockholders by making misleading statements that were an essential link in stockholders heeding Facebook's recommendation to re-elect the current Board and vote against stockholder proposals for the Company to adopt a policy to require the Company to disclose information about the misuse of Facebook's platform.

207.    Plaintiff, on behalf of Facebook, thereby seeks injunctive and equitable relief because the conduct of the Individual Defendants interfered with Plaintiff's voting rights and choices at the 2017 annual meeting.   Plaintiff does not seek any monetary damages for the proxy law violations.

Shareholder Derivative Complaint                                                    57

208.    This action was timely commenced within three years of the date of the 2017 Proxy and within one year from the time Plaintiff discovered or reasonably could have discovered the facts on which this claim is based.

## COUNT VII
### Unjust Enrichment
### (Against All Individual Defendants)

209.    Plaintiff incorporates by reference and re-alleges each of the preceding paragraphs as if fully set forth herein.

210.    During the Relevant Period, Defendants received bonuses, stock options, stock, or similar compensation from Facebook that was tied to the Company's financial performance, or otherwise received compensation that was unjust in light of Defendants' bad faith conduct, violation of Facebook's code of ethics, and self-dealing.

211.    Plaintiff, as a shareholder and representative of Facebook, seeks restitution from the Individual Defendants and seeks an order of this Court disgorging all profits, benefits, and other compensation — including any salary, options, performance-based compensation, and stock — obtained by the Individual Defendants due to their wrongful conduct alleged in this Complaint.

## COUNT VIII
### Declaratory Relief
### (Against All Individual Defendants)

212.    Plaintiff incorporates by reference and re-alleges each of the foregoing allegations as though fully set forth in this paragraph.

213.    Plaintiff, in addition to being a shareholder of Facebook, was a Facebook user at the time of the Cambridge Analytica data misappropriation.  As such, Plaintiff was subject to a written user agreement governing the terms of her use of the Facebook platform.

214.    Plaintiff's user agreement with Facebook includes a "Rights and Responsibilities Agreement," which states that any dispute between Facebook and any of its users must be brought in either the United States District Court for the Northern District of California or a state court in San Mateo County, and that California law

Shareholder Derivative Complaint                                                    58

applies to any disputes:  "You will resolve any claim, cause of action or dispute (claim) you have with us arising out of or relating to this Statement or Facebook exclusively in the U.S. District Court for the Northern District of California or a state court located in San Mateo County, and you agree to submit to the personal jurisdiction of such courts for the purpose of litigating all such claims.  The laws of the State of California will govern this Statement, as well as any claim that might arise between you and us, without regard to conflict of law provisions."

215.    In its written agreements governing Plaintiff's use of Facebook, Facebook promised Plaintiff that it would safeguard her data and promptly notify her of any data breaches or data misappropriation.

216.    Facebook's Data Policy is also part of Facebook's written agreements with its users, including Plaintiff.  It states that:  "we don't share information we receive about you with others unless we have:

- received your permission;
- given you notice, such as by telling you about it in this policy; or
- removed your name and any other personally identifying information from it."

217.    Facebook's Data Privacy policy also states:  "California law permits residents of California to request certain details about what personal information a company shares with third parties for the third parties' direct marketing purposes.  Facebook does not share your information with third parties for the third parties' own and independent direct marketing purposes unless we receive your permission."

218.    The Cambridge Analytica incident occurred approximately two years ago, and yet Facebook has still never notified any of its users that a data misappropriation occurred or provided any of the other details required by state and federal law.  For example, California law requires a business to notify any California resident whose unencrypted personal information, as defined, was acquired, or reasonably believed to have been acquired, by an unauthorized person.  CAL. CIV. CODE § 1798.82(a).  The

statute provides that: "The disclosure shall be made in the most expedient time possible and without unreasonable delay, consistent with the legitimate needs of law enforcement, as provided in subdivision (c), or any measures necessary to determine the scope of the breach and restore the reasonable integrity of the data system." *Id.*

219.   Plaintiff seeks a declaration that Facebook has breached the terms of its user agreements, including the Data Policy, by not providing timely notice of the Cambridge Analytica data misappropriation, as required by applicable law.

220.   Plaintiff also seeks an injunction ordering Facebook to provide notice to its users of the data misappropriation.

221.   California has a substantial interest in the contracts, including Facebook's obligations under the Data Privacy agreement, because the agreement was drafted and executed by Facebook, whose headquarters are in San Mateo County, California, because Plaintiff is a California resident, and because much if not all of the relevant conduct occurred in San Mateo County.

222.   There exists a substantial controversy of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.  Facebook has failed to notify its users of the data misappropriation in a timely manner and has failed to comply with other obligations under its user agreements.  The failure of Facebook to notify its users of the data misappropriation, including the specific information required to be disclosed by law, threatens irreparable harm to users.

223.   A judicial declaration pursuant to 28 U.S.C. § 2201 and California Code of Civil Procedure § 1060 is necessary and appropriate at this time so that Plaintiff's rights under the Rights and Responsibilities Agreement may be determined with certainty.

224.   Accordingly, in connection with the active case and controversy between Plaintiff and Defendants, Plaintiff seeks declaratory relief under 28 U.S.C. § 2201 and California Code of Civil Procedure § 1060, declaring that:

a.   Facebook has breached the terms of its user agreements, including the Data Policy, by not providing timely notice of the Cambridge Analytica data

misappropriation, as required by applicable law;

    b.    Facebook's user privacy and data security is deficient;

    c.    Facebook's internal and disclosure controls are deficient; and

    d.    Facebook has a duty to immediately notify affected users of the data misappropriation.

**COUNT IX**
**Contribution and Indemnification**
**(Against All Individual Defendants)**

225.    Plaintiff incorporates by reference and re-alleges each of the foregoing allegations as though fully set forth in this paragraph.

226.    This claim is brought derivatively on behalf of the Company against Defendants for contribution and indemnification.

227.    Facebook is named as a defendant in a putative shareholder class action filed in this District on March 20, 2018, asserting claims under the federal securities laws for, *inter alia*, false and misleading statements related to the Company's user privacy practices.  In the event the Company is found liable for violating the federal securities laws, its liability will arise, in whole or in part, from the intentional, knowing, or reckless acts or omissions of some or all of the Defendants as alleged herein.  The Company is entitled to receive contribution from those Defendants in connection with the securities fraud class action against the Company currently pending in this District.

228.    Accordingly, Facebook is entitled to all appropriate contribution or indemnification from Defendants.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for judgment in favor of Plaintiff and Facebook and against all Defendants as follows:

A.    Declaring that Plaintiff may maintain this action on behalf of Facebook and that Plaintiff is an adequate representative of Facebook;

B.    Declaring that the Individual Defendants have breached their fiduciary duties to Facebook and aided and abetted breaches of fiduciary duties;

C.     Declaring that the Insider Trading Defendants engaged in insider trading and violated California Corporations Code § 25402;

D.     Declaring that the Individual Defendants violated California Corporations Code § 25403;

E.     Declaring that the Individual Defendants violated Section 14(a) of the Exchange Act and SEC Rule 14a-9 promulgated thereunder;

F.     Declaring that Facebook's user privacy and data security is deficient and that Facebook's internal and disclosure controls are deficient;

G.     Determining and awarding to Facebook the damages sustained by it as a result of the violations set forth above from each Defendant, jointly and severally, together with pre-judgment and post-judgment interest thereon;

H.     Directing Facebook and the Individual Defendants to take all necessary actions to reform and improve Facebook's corporate governance and internal procedures to comply with applicable laws and to protect Facebook and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote resolutions for amendments to the Company's Bylaws or Articles of Incorporation and taking such other actions as may be necessary to place before shareholders for a vote a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board, and to ensure proper corporate governance policies, including, among other things:

(i)     a proposal to strengthen Board oversight and supervision of Facebook's user privacy and data security practices;

(ii)     a proposal to strengthen the Company's internal and disclosure controls to ensure material information is adequately and timely disclosed to the SEC and the public; and

(iii)     a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater stockholder input into the

policies and guidelines of the Board;

I.      Awarding Facebook restitution from the Individual Defendants and each of them, and ordering them to disgorge all inequitable profits, benefits, and other compensation, including the proceeds of illegal insider trading;

J.      Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

K.      Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

Dated:  March 27, 2018

Respectfully submitted,

BOTTINI & BOTTINI, INC.
Francis A. Bottini, Jr. (SBN 175783)
Yury A. Kolesnikov (SBN 271173)

s/ Francis A. Bottini, Jr.
Francis A. Bottini, Jr.

7817 Ivanhoe Avenue, Suite 102
La Jolla, California 92037
Telephone:    (858) 914-2001
Facsimile:    (858) 914-2002
E-mail:       fbottini@bottinilaw.com
              ykolesnikov@bottinilaw.com

*Attorneys for Plaintiff Natalie Ocegueda*

**VERIFICATION**

I, Natalie Ocegueda, verify that I am a shareholder of Facebook, Inc.  I have reviewed the allegations in this Verified Shareholder Derivative Complaint.  As to those allegations of which I have personal knowledge, I believe them to be true; as to those allegations of which I lack personal knowledge, I rely upon my counsel and counsel's investigation, and believe them to be true.  Having received a copy of the complaint and reviewed it with counsel, I authorize its filing.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.  Executed on March 27, 2018.

_Natalie Ocegueda_
_____
Natalie Ocegueda